**VIEW ENGINEERING, INC.,**
**Plaintiff–Appellee,**

v.

**ROBOTIC VISION SYSTEMS,**
**INC., Defendant,**

**and**

**Morrison Law Firm, Appellant.**

**No. 99–1399.**

United States Court of Appeals,
Federal Circuit.

March 29, 2000

---

Ernie L. Brooks, Brooks & Kushman, P.C., of Southfield, Michigan, argued for plaintiff-appellee. With him on the brief was Frank A. Angileri.

David L. Just, Lucas & Just, LLP, of New York, New York, argued for appellant. With him on the brief were Donald C. Lucas.

Before MICHEL, LOURIE, and LINN, Circuit Judges.

MICHEL, Circuit Judge.

The Morrison Law Firm ("Morrison") appeals from the decision of the United States District Court for the Central District of California sanctioning Morrison under Rule 11 of the Federal Rules of Civil Procedure. *See View Eng'g, Inc. v. Robotic Vision Sys., Inc.,* No. CV 95–1882 (C.D.Ca. Apr. 14, 1999). On March 24, 1995, Paul, Hastings, Janofsky and Walker, on behalf of View Engineering, Inc. ("View"), filed a claim for declaratory relief against Robotic Vision Systems, Inc. ("Robotic") seeking to have Robotic's U.S. Patent No. 4,238,147 ("the '147 patent") declared invalid, or, in the alternative, seeking a finding of no infringement. On July 18, 1995, Morrison, through its local counsel, Arter & Hadden, on behalf of Robotic, filed an answer, counterclaiming that View infringed eight of its patents. On April 15, 1996, View filed a motion for summary judgment and for sanctions, alleging that Robotic's counterclaims were without merit. On April 22, 1996, Robotic withdrew its counterclaims for infringement on two of the eight patents. By May 20, 1996, Robotic withdrew its counter-

claims with respect to three more of the eight patents, leaving three patents at suit. On June 24, 1996, the district court granted View's motion for summary judgment of no infringement on those three remaining patents. In addition, the district court granted View's motion for Rule 11 sanctions against Morrison, Robotic's counsel of record. The appeal was submitted for our decision following oral argument on March 6, 2000. We affirm the district court's award of sanctions under Rule 11.

## BACKGROUND

View and Robotic were competitors in the field of three-dimensional vision technology, a technology whose principal use is the scanning of computer chips to insure that the leads are properly aligned.[1] Robotic holds the '147 patent (entitled "Recording Images of a Three–Dimensional Surface by Focusing on a Plane of Light Irradiating the Surface").

On March 24, 1995, Paul, Hastings, Janofsky and Walker, on behalf of View, filed a claim for declaratory relief against Robotic, seeking to have the '147 patent declared invalid, and, in the alternative, seeking a finding of no infringement by View of the '147 patent. On July 18, 1995, Morrison, through its local counsel, Arter & Hadden, on behalf of Robotic, filed an answer. Robotic also counterclaimed alleging that View's products infringed eight distinct patents—including the one View sought to have invalidated. At this point Robotic had not seen View's products. Robotic's counterclaims were, in fact, based solely on Howard Stern's[2] "belief ... based on [his] knowledge of the [Robotic] patents, View's own advertising and

its claims to customers as to what its machines did, and [his] knowledge and understanding of the technology required [in the field.]" *Stern Aff.* ¶ 16.

Robotic served its first discovery requests on October 6, 1995. Discovery requests for documents went unanswered by View until April 12, 1996 when Robotic and View signed a protective order. View then produced approximately 1700 pages of documents marked "Attorneys Eyes Only".[3] Robotic protested the marking of all 1700 pages "Attorneys Eyes Only" and the marking was lifted on the manuals provided to View's customers for their machines.

After the manuals released to Robotic, Robotic determined that there was no infringement of two of the patents and on April 22, 1996, Robotic withdrew its infringement counterclaims with regard to those two patents. Robotic then engaged an expert to review the remaining documents, and withdrew its charge of infringement with regard to three more patents by May 20, 1996.

In the meantime, on April 15, 1996, View moved for sanctions against Robotic and Morrison, stating that there was no reasonable basis under Rule 11 for their filing of counterclaims accusing View of infringing 120 claims of eight different patents. On June 26, 1996, Judge Baird awarded sanctions against Morrison in the amount of 75% of View's costs, including attorney fees, from the time of filing of the counterclaims through the motion for sanctions. It is undisputed that Morrison made the filing decision—Mr. Stern stated in his affidavit that "in reliance on [Morrison's] advice that [Robotic] had sufficient

---

1. View is no longer in business, having been acquired by General Scanning, Inc.

2. Howard Stern is a Senior Vice–President and a member of the Board of Directors of Robotic. He is the inventor or co-inventor of more than fifty patents, including four of the eight patents that are at issue in this litigation. *See Stern Aff.* ¶¶ 2, 4.

3. Under the protective order these documents were reviewable by the outside counsel in-

volved in the case, outside experts who completed and signed a Confidentiality Statement, and any other person designated as a Qualified Person by order of the district court. In other words, the only people who were not permitted to review materials marked as "Attorneys Eyes Only" were employees of Robotic and/or View—depending on who had produced the materials.

grounds to assert a counterclaim, [Robotic] authorized the filing of the counterclaims alleging infringement of the eight patents at issue. No officer at [Robotic] signed or verified the counterclaim." *Stern Aff.* ¶ 17. The district court found that Robotic was justified in relying upon Morrison for legal advice, but that Morrison had violated Rule 11(b) by filing suit before making a reasonable inquiry into the facts. The judge found, furthermore, that this was only true for six of the eight patents on which counterclaims were filed, and, therefore awarded View only 75% of their attorney fees.

Morrison appealed the June 26, 1996, Order awarding sanctions against it before the court actually quantified the sanctions award. The Federal Circuit dismissed the appeal, on the basis that the sanction was not final, and thus not appealable, since the amount of the sanction had not yet been determined, and remanded the case. *See View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 1997 U.S.App. LEXIS 13741 (Fed. Cir.1997).

On remand, the district court quantified the sanctions amount as $97,825.48 and retracted its previous order on June 24, 1996, to the extent that it held that View was entitled to 75% of its fees. The district court stated "that this amount [was] necessary to act as a future deterrent to attorneys considering filing suit without first performing a reasonable inquiry as to the existence of a valid claim." *View Eng'g,* slip op. at 25–26.

Morrison timely appealed the sanctions to this court. We have jurisdiction under 28 U.S.C. § 1295 (1994).

## DISCUSSION

■ Rule 11 of the Federal Rules of Civil Procedure imposes a duty on attorneys to certify by their signature that (1) they have read the pleadings or the motions they file and (2) the pleading or motion is "well-grounded in fact," has a colorable basis in law, and is not filed for an improper purpose. Fed.R.Civ.P. 11. Judge Baird held in the instant case that Morrison failed to conduct a reasonable inquiry into the facts before filing counterclaims for Robotic, and so sanctioned Morrison. Rule 11 sanctions are reviewed for the error underlying them under the abuse of discretion standard. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). The abuse of discretion standard applies to both the decision to sanction, and the amount of the sanction. *See Id.* The Supreme Court has held that the "central purpose of Rule 11 is to deter baseless filings.... Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact [and] legally tenable...." *Id.* at 393, 110 S.Ct. 2447. We must, therefore, determine whether Judge Baird abused her discretion in determining that at the time Morrison filed the infringement counterclaims it had failed to conduct a reasonable inquiry into their legal and factual bases.

## I.

■ Robotic admits that it had no factual basis for its counterclaims.[4] At the time

---

**4.** The 9th Circuit has held that an attorney may not be sanctioned under Rule 11 "for a complaint that is not well-founded, so long as she conducted a reasonable inquiry ... [nor][m]ay she be sanctioned for a complaint which is well-founded, solely because she failed to conduct a reasonable inquiry." *In re Keegan Management Co. Sec. Litig.*, 78 F.3d 431, 434 (9th Cir.1996); *cf. S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372, 1375, 40 U.S.P.Q.2d 1140, 1143 (Fed.Cir.

1996) (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir.1990), this court held that "[a] 'frivolous' argument or claim is one that is 'both baseless and made without a reasonable and competent inquiry.' ")

We hold today that the application of Rule 11 sanctions in this instance was justified, since Robotic's counterclaims were neither well-founded nor the subject of a reasonable inquiry. *See* discussion *infra.*

the counterclaims were filed, the only basis for their filing was the belief of Howard Stern that the View devices probably infringed the Robotic patents. This belief, in turn, was based solely on his knowledge of the Robotic patents, View's advertising, and the statements View made to its own customers. Howard Stern never had physical access to any of the View machines before the filing of the 120 counterclaims of infringement of eight patents.[5] Morrison's co-counsel, Martin Stein, stated that Robotic filed the counterclaims so it could have "access to View's software and drawings [otherwise] … View [could not] possibly hope to convince [Robotic] that it is not infringing one or more of the eight patents." *Letter from Stein to Angileri* at 2 (Mar. 19, 1996), J.A. at 254. Morrison performed no independent claim construction analysis, nor did it do any formal written infringement analysis before filing the counterclaims. Roger S. Thompson, an attorney with Morrison, states in his affidavit that they relied upon Mr. Stern's review of the technology, and that based on this, and "[their] review of the patents-in-suit and View's literature, [they] prepared the counterclaims herein and authorized their filing by [their] local counsel." *Thompson Aff.* ¶ 20. No reference is made to any claim construction or infringement analysis on the part of Morrison. In fact, Thompson stated that Morrison's belief that View infringed Robotic's patents was "based on what we could learn about View's machines from publicly available information, and View's literature." *Id.* ¶ 11. Thompson stated, further, that upon being asked "exactly why, on an element by element basis, [Robotic] felt View infringed the '147 patent" Morrison responded that it "could not do so in that sort of detail until [it] learned what View actually did." *Id.* ¶ 12. Even relatively standard litigation tactics, such as being asked "for an infringement claim chart struck [Thompson] as a stonewalling tactic which raised [his] suspicions that View was being deliberately evasive." *Id.* ¶ 14. In other words, Morrison filed counterclaims on eight patents containing 120 distinct claims which View was accused of infringing based only on Robotic's Vice President's belief that "it was likely that View would infringe the eight patents, and he had no information which would lead him to a different conclusion." *Id.* ¶ 19. Robotic states that "[s]ince View refused to permit examination of its machine or drawings, there was no way for [Robotic] to determine if View was *actually* infringing the eight patents until [Robotic] had an opportunity to complete at least preliminary discovery." Appellant's Br. at 12.

Morrison admits in its brief that "since no opportunity had ever been afforded [Robotic] to study the View machine or the technical drawings thereof, and, because of the complexity of the machines involved, it was virtually impossible to determine infringement to a certainty from a visual inspection of the machines." *Id.* at 6. Once Robotic was able to review View's manuals, nine months after filing its counterclaims, Robotic "determined that there was no infringement of the '567 and '894 patents; however, [it still felt that] nothing could be determined with respect to infringement of the other six patents." *Id.* at 7. Finally, Morrison states in its brief that it "continually told View that once discovery was allowed, it would re-evaluate the infringement issue and withdraw any claim of infringement where the discovery evidence proved non-infringement." *Id.* at 8.

Morrison's only defense in the instant case is to blame View for being uncooperative. Morrison argues that if View had not

---

5. Howard Stern stated in his affidavit:
Further investigation was impossible since the View machine cost several hundred thousand dollars to purchase, and it did not make any economic sense to purchase a machine just for the purpose of making further investigation. In addition, since View is a competitor of [Robotic], it is doubtful that it would have sold [Robotic] a machine in any event.
*Stern Aff.* ¶ 19.

gone out of its way to be uncooperative from the very beginning, even before View filed for declaratory judgment, then it would never have filed the baseless counterclaims at issue here, and no sanctions would have been imposed. View was not sanctioned by the court for its actions, and we have not been persuaded that View was such a bad actor that Robotic was justified in its actions. View is not required to allow pre-litigation discovery, as requested by Robotic[6], nor is it required to allow Robotic any discovery not approved by the court. Once a protective order was entered into, View turned over 1700 pages of documents, "which, when ultimately produced, did lead to the withdrawal by [Robotic] of infringement charges as to five of the eight patents." *Id.* at 17. View was not required, in this case, to allow Robotic's officers access to View's trade secrets.

Four months passed between the time that View filed for declaratory judgment against Robotic, and Robotic filed its eight infringement counterclaims. Morrison had four months to conduct a reasonable inquiry into whether or not View's products infringed any of Robotic's fifty patents. During this time Morrison was afforded ample opportunity to construe the 120 claims View was eventually accused of infringing, and determine which of them View reasonably could be accused of infringing. Morrison had the opportunity to file immediately for the protective order that eventually resulted in discovery, to appoint an outside expert to review View's machines, to talk to Robotic's sales corps to learn what it knew of View's machines—in other words to conduct some form of reasonable inquiry.

■ We agree with Judge Baird's decision that little inquiry, much less a reasonable one, was undertaken by Morrison in the instant case. Before filing counterclaims of patent infringement, Rule 11, we think, must be interpreted to require the law firm to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted. The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11. Morrison performed neither a formal nor an informal analysis of any sort. This cannot be found to be a reasonable inquiry for the purpose of filing patent infringement claims.

■ A patent suit can be an expensive proposition. Defending against baseless claims of infringement subjects the alleged infringer to undue costs—precisely the scenario Rule 11 contemplates. Performing a pre-filing assessment of the basis of each infringement claim is, therefore, extremely important. In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement. Failure to do so should ordinarily result in the district court expressing its broad discretion in favor of Rule 11 sanctions, at least in the absence of a sound excuse or considerable mitigating circumstances.

Morrison was not, as its counsel argues, acting merely to protect its client's interests, for it did not even take the minimum steps required to determine what its client's interests truly were.

Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are

---

6. According to Morrison's brief: "[Robotic] demanded pre-litigation inspection of View's machine, but View denied such." Appellant's Br. at 13; "View was asked, informally, even before suit commenced for information that could have avoided the prosecution of the claims which the District Court found without merit." Appellant's Br. at 24; "View refused to permit any pre-litigation inspection of its machine." Appellant's Br. at 22.

well-grounded in fact, legally tenable, and "not interposed for any improper purpose." An attorney who signs the paper without such a substantiated belief "shall" be penalized by "an appropriate sanction." Such a sanction may, but need not, include payment of the other parties' expenses.

*Cooter & Gell,* 496 U.S. at 393, 110 S.Ct. 2447. Accordingly, we affirm the district court's imposition of sanctions.

## II.

■ The sanctions amount awarded here by Judge Baird was based on a lodestar[7] of View's expenses in defending against the baseless counterclaims. Morrison argues that it will be bankrupt if required to pay the $97,825.48 sanction imposed under Rule 11, and that Judge Baird abused her discretion in assessing such an amount.

We start by noting that Judge Baird's sanction of less than $100,000 may not cover the costs to View of defending against the allegations of infringement of eight patents containing 120 claims. We next note that this sum was meant by Judge Baird to deter not only Morrison but other lawyers from filing baseless infringement claims or counterclaims, and that that is one of the purposes of Rule 11. Finally, we note that Judge Baird greatly reduced the original lodestar of $237,-152.68 to reach the final sanction amount.

■ On August 30, 1996, View filed with Judge Baird, under seal, itemized declarations of View's costs. View did not serve the declarations upon Morrison until August 10, 1998.[8] Judge Baird reviewed View's fee request to determine whether it was reasonable and to decide what a reasonable lodestar would be. The fee applicant, in this case View, has the burden of proving that the "requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Schwarz v. Secretary of Health & Human Serv.,* 73 F.3d 895, 908 (9th Cir.1995) (quoting *Jordan v. Multnomah County,* 815 F.2d 1258, 1262–63 (9th Cir.1987) (citing *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984))).

The district court reviewed View's Itemized Billing Statements, which listed the name of each attorney who worked on the case from Paul, Hastings, Janofsky and Walker, and from Brooks and Kushman, P.C., their billing rate, and the total hours each lawyer expended on the case. In addition to the attorney fees, the Itemized Billing Statements include $30,392.53 in costs. Thus, View's fee request, the total amount billed to View for attorney fees and costs in defending against Robotic's counterclaims, was $241,010.58. Judge Baird did not use View's fee request as the lodestar in the instant case for reasons detailed below.

The American Intellectual Property Law Association ("AIPLA") publishes an Economic Survey every year listing billing rates for intellectual property attorneys based on their degree of experience. The district court reviewed the billing rates of each attorney on the case, and compared them to the billing rates reflected for intellectual property attorneys of similar experience in the 1995 Economic Survey. Based on these comparisons the judge reduced the billing rates of all the attorneys and staff at Paul, Hastings, Janofsky and Walker, finding that their rates were on the high-end of rates charged by other intellectual property attorneys with equivalent experience. The district court also reviewed the actual hours billed to View and determined that "given the number of patents at issue, [and] the complexity of the patents and accused devices" the num-

7. The lodestar is determined by multiplying the number of hours reasonably expended by the reasonable hourly rate.

8. View stated that this delay was caused by a misunderstanding with the district court Clerk's office. Judge Baird commented no further on the delay, and so, neither do we.

ber of hours billed seemed reasonable. The lower rates at which the judge calculated Paul, Hastings, Janofsky and Walker's billable hours, resulted in a lodestar of $237,152.68—approximately $4,000 less than View's fee request. *See View Eng.'g,* slip op. at 16.

We approve Judge Baird's initial lodestar determination of $237,152.68. Judge Baird then took a number of factors into consideration in decreasing this lodestar. *See Jordan,* 815 F.2d at 1262. The judge determined that View only had to defend itself against completely baseless and harassing counterclaims on six of the eight patents and therefore reduced the aggregate costs requested by View by forty-five percent,[9] leaving a lodestar of $130,433.97.

The district court then looked at Morrison's ability to pay the sanctions, a relevant factor in determining a reasonable sum. *See In re Yagman,* 796 F.2d 1165, 1185 (9th Cir.1986). Thomas R. Morrison asserted that he was the sole proprietor of the Morrison Law Firm and that such sanctions might force him into bankruptcy, and at a minimum would be "ruinous and catastrophic" to him personally. In support of this, Mr. Morrison submitted copies of the Morrison Law Firm's tax returns for the four tax years preceding the sanctions award. These tax returns reflect a net loss of $187,570.00. The district court acknowledged that in and of themselves, these returns might be indicative of Mr. Morrison's inability to pay the sanctions. The court noted, however, that Robotic paid Mr. Morrison for this action, and that the Morrison Law Firm recognized gross receipts of $8,280,957.00 for the four years preceding the award of the sanctions. Furthermore, the Morrison Law Firm paid $3,603,110.00 in wages to attorneys in the Morrison Law Firm for those four years against gross receipts of $8,280,957.00, which works out to an average of $900,777.50 per tax year paid out in wages

against average gross receipts of $2,070,239.25. Mr. Morrison did not respond to these figures despite being ordered to so do by the district court, but merely stated that the $187,570.00 loss reflected on the Morrison Law Firm tax returns for the last four years accurately reflected his salary for the years in question.

We cannot find it clear error for the district court to decline to credit Mr. Morrison's statement in this case. As Judge Baird stated, "[t]his [district] Court has trouble swallowing the proposition that Mr. Morrison paid out $3,603,110.00 in salaries to his associates and staff while taking an aggregate loss to himself of $187,570.00." *View Eng'g,* slip op. at 24–25.

The district court went on to state that it was "empathetic to the fact that a sizable sanction will be detrimental to the well-being of a small law firm. As such, the Court is reducing the amount of the lodestar by twenty-five percent." *Id.* at 25. The final sanctions awarded, therefore, were reduced to $97,825.48.

Judge Baird was thorough and more than fair in considering all the different factors when she calculated the sanctions amount. We do not find that she abused her discretion in any way, and we can only commend her for her careful and thoughtful opinion.

## CONCLUSION

The decision to impose sanctions at the stated amount, therefore, is in all respects

*AFFIRMED.*

---

9. The district court reached this forty-five percent figure by determining that in order for View to have defended itself against two of

the eight patents, it would still have incurred between forty and fifty percent of its costs.