**RESQNET.COM, INC., Plaintiff,**

v.

**LANSA, INC., Defendant.**

**No. 01 Civ.3578(RWS).**

United States District Court,
S.D. New York.

Jan. 13, 2005.

426

invalidity defense. ResQNet subsequently brought its own motion for partial summary judgment pursuant to Rule 56 on the ground that the newlook software distributed by Lansa infringes the '075 Patent, and Lansa cross-moved for partial summary judgment of non-infringement of the '075 Patent and moved separately for partial summary judgment on the ground of non-infringement of U.S. Patent No. 5,831,608 (the " '608 Patent"). Lansa has also moved for leave to amend its answer and counterclaims pursuant to Rules 9 and 15(a) of the Federal Rules of Civil Procedure, with respect to which motion ResQNet has moved for leave to file a surreply. Finally, Lansa has moved for sanctions against ResQNet pursuant to Rule 11 of the Federal Rules of Civil Procedure, and ResQNet has cross-moved for similar sanctions against Lansa as well as for the revocation of the *pro hac vice* admission of Lansa's counsel, James H. Hulme, Esq. ("Hulme").

For the reasons set forth below, Lansa's motion for partial summary judgment of invalidity of the '075 Patent is denied, ResQNet's motion to strike the invalidity defense as to the '075 Patent is denied, ResQNet's motion for partial summary judgment of infringement of the '075 Patent is denied, Lansa's motion for partial summary judgment of non-infringement of the '075 Patent is denied, Lansa's motion for partial summary judgment of non-infringement of the '608 Patent is denied, ResQNet's motion for leave to file a surreply is granted, Lansa's motion for leave to amend its answer and counterclaims is granted, Lansa's motion for sanctions is granted in part and otherwise denied, and ResQNet's motion for sanctions and to revoke the *pro hac vice* status of Lansa's counsel is denied.

Kaplan & Gilman, Woodbridge, NJ (Jeffrey I. Kaplan, of counsel), for plaintiff.

Arent Fox, New York, NY (Steven Kimelman, David N. Wynn, of counsel), Arent Fox, Washington, DC (James H. Hulme, of counsel), for defendant.

## *OPINION*

SWEET, District Judge.

In this patent infringement action, defendant Lansa, Inc. ("Lansa") has moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that U.S. Patent No. 6,295,075 (the " '075 Patent") is invalid, and plaintiff ResQNet.com, Inc. ("ResQNet") has cross-moved to strike Lansa's

### *Prior Proceedings*

This action was commenced on April 27, 2001. According to the complaint filed on

that date, Lansa was producing, offering for sale and selling various products alleged to infringe four patents held by ResQNet, namely, U.S. Patent No. 5,530,961 (the "'961 Patent"), U.S. Patent No. 5,792,659 (the "'659 Patent"), U.S. Patent No. 5,812,127 (the "'127 Patent"), and the '608 Patent. An amended complaint was filed on December 4, 2001, alleging infringement of the same four patents previously named as well as the '075 Patent.

Discovery with respect to claim construction issues proceeded, ResQNet withdrew its allegations of infringement concerning the '659 Patent and the '127 Patent, and a *Markman* hearing was held on June 12, 2002 with regard to the remaining patents-in-suit. The opinion of the Court construing certain claims of the '961 Patent, the '608 Patent and the '075 Patent was rendered in September 2002. *See ResQNet.com v. Lansa, Inc.*, No. 01 Civ. 3578(RWS), 2002 WL 31002811 (S.D.N.Y. Sept.5, 2002) ("*ResQNet I*"). On November 4, 2002 the parties entered into a consent judgment acknowledging the withdrawal by ResQNet of all allegations that newlook infringed the patents named in the amended complaint with the exception of one claim each from the '961 Patent, the '608 Patent, and the '075 Patent, and stipulating that Lansa's systems would not infringe these remaining claims in light of the holding of *ResQNet I*. On October 16, 2003, the U.S. Court of Appeals for the Federal Circuit affirmed this Court's construction of the '961 Patent's claim and reversed in part the construction of claim 1 of the '608 Patent and claim 1 of the '075 Patent. *See ResQNet.com v. Lansa, Inc.*, 346 F.3d 1374 (Fed.Cir.2003) ("*ResQNet II*"). Familiarity with *ResQNet I* and *ResQNet II* is assumed.

Discovery resumed, and on April 27, 2004, Lansa filed its first motion for partial summary judgment on the '075 Patent, asserting the invalidity of the '075 Patent. ResQNet cross-moved to strike Lansa's invalidity defense as insufficient. Oral arguments on both motions were heard on May 19, 2004, after which ResQNet submitted a letter brief to which Lansa responded on May 24, 2004.

While these motions were pending, Lansa's subpoena issued to the third-party witness and counsel to ResQNet, Jeffrey I. Kaplan, was quashed in July 2004. *See ResQNet.com v. Lansa, Inc.*, No. 01 Civ. 3578(RWS), 2004 WL 1627170 (S.D.N.Y. July 21, 2004) ("*ResQNet III*"). In light of certain of the conclusions reached in *ResQNet III*, Lansa moved to amend its answer and counterclaims on August 4, 2004. Following briefing, including a letter motion by ResQNet for leave to file a surreply, Lansa's motion and ResQNet's letter motion were deemed fully submitted without oral argument on August 25, 2004.

In the interim, ResQNet filed a motion for partial summary judgment on the '075 Patent on August 20, 2004, claiming infringement of the '075 Patent. Lansa cross-moved for partial summary judgment of non-infringement as to the '075 Patent on August 23, 2004 and interposed a separate motion for summary judgment of non-infringement with respect to the '608 Patent. Following further briefing, as well as the submission by Lansa of certain supplemental materials with respect to its earlier motion for partial summary judgment on the '075 Patent and the submission by ResQNet of a response to Lansa's supplemental submission,[1] oral arguments were heard on September 29, 2004, at which time these motions too were deemed fully submitted.

---

1. These submissions bring the total number of formal briefs and letter briefs on the underlying motion and cross-motion to eight.

Prior to oral arguments on the partial summary judgment motions on September 29, 2004, Lansa filed a motion pursuant to Rule 11, Fed.R.Civ.P., seeking sanctions on the ground, *inter alia,* that ResQNet had failed to conduct an adequate pre-filing investigation before commencing this litigation. ResQNet filed a cross-motion for Rule 11 sanctions and for the revocation of the *pro hac vice* admission of Lansa's counsel, Hulme, on October 18, 2004. Following further briefing, the submission of a surreply memorandum by Lansa and the submission by ResQNet of a declaration in response to the surreply, oral arguments were heard on these latest motions on October 27, 2004, at which time they were deemed fully submitted.

### The Patents–In–Suit

As a result of the withdrawal by ResQNet of its allegations of infringement concerning the '659 Patent and the '127 Patent and the subsequent affirmance of this Court's construction of the relevant claim of the '961 Patent by the Federal Circuit, *see ResQNet II,* 346 F.3d at 1378–82, only one claim each from the two remaining patents are at issue here: claim 1 of the '608 Patent and claim 1 of the '075 Patent.

Both of the remaining patents-in-suit "claim, in relevant part, 'screen recognition' and terminal emulation—processes that download a screen of information from a remote mainframe computer onto a local personal computer (PC)." *Id.* at 1375. As the Federal Circuit explained in *ResQNet II,* by way of general background,

> Mainframe computers permit multiple users to simultaneously access one central computer. Before the widespread use of PCs, each user would connect to the mainframe using a so-called "dumb

terminal." ... A dumb terminal, as its name implies, did not process or reformat the data received from the mainframe. Rather, the dumb terminal simply displayed the information from the mainframe. Symmetrically, the dumb terminal sent all data entry back to the mainframe for processing. Because a dumb terminal's monitor generally was a monochromatic green, the display was called a "green screen."

> Gradually, PCs replaced dumb terminals. Unlike a dumb terminal, a PC does not merely send and receive information. Rather, a PC uses software to facilitate communication to and from the mainframe. With that software, a PC does not simply mimic a dumb terminal, but processes the information into a graphical user interface (GUI) format, which is much more user-friendly. Although the GUI format displays and receives information to and from the user, the PC still sends and receives information only in the manner understood by the mainframe, i.e., as if a dumb terminal were connected to the mainframe. In relevant part, the asserted patents specifically facilitate recognition of the information that the mainframe sends to the PC.

*Id.* at 1375–76; *see also ResQNet I,* 2002 WL 31002811, at *1 (noting the parties' agreement "that the technology at issue in this case relates to 'screen recognition' software that translates between the GUI world of the PC and the plain text, green-screen world of the legacy mainframe system"). A graphical user interface ("GUI") format includes "icons, windows, help menus, and other features that represent the standard well-known interfaces in today's modern PCs." *Id.*

The '608 Patent contains a single claim with limitations written in a means-plus-function form,[2] as follows:

**2.** "A patent claim may recite a 'means for' or 'step for' performing a specified function or

Apparatus for implementing a computer terminal to be connected to a remote computer, said apparatus comprising:

 means for identifying a particular user logged on to said remote computer through said computer terminal;

 means for identifying, based upon a position, length and type of each of a plurality of fields, a particular screen to be displayed to said user; and

 a plurality of special function keys, each key performing a specified function, the specified function performed for each key being determined by the particular user logged on and the particular screen identified to be displayed.

('608 Patent, col. 4, ll. 38–49.)

The claimed function of the '608 Patent is " 'identifying . . . a particular screen to be displayed to said user.' " *ResQNet II*, 346 F.3d at 1382 (citation omitted). The specification, as the Federal Circuit observed in *ResQNet II*, "sets forth the corresponding structure: 'Upon a screen of information being downloaded to a personal computer 103, the personal computer analyzes the screen with respect to the location of particular fields, and other attributes thereof, in order to recognize the particular screen downloaded.' " *Id.* (citation omitted). Thus,

[S]imilar to the '961 patent, the structure is an algorithm for analyzing the downloaded information to generate a screen ID. Further similar to the '961 patent, neither the function nor its corresponding structure alone resolves the claim construction issue because that is-

sue depends on which fields the algorithm employs in "identifying . . . a particular screen to be displayed to said user." '608 patent, col. 4, ll. 42–44. These similarities reflect the parentage of the '608 patent, which is a continuation-in-part (CIP) of the '961 patent. *Id.* The Federal Circuit resolved the claim construction issue of "which fields the algorithm employs" by construing "each of a plurality of fields" as recited in claim 1 to mean "each of at least two fields." *See id.* at 1382–83. The Federal Circuit did not disturb this Court's prior ruling that the algorithm at issue in claim 1 of the '608 Patent "is dependent on three parameters for identifying a screen: position, length, and type." *ResQNet I*, 2002 WL 31002811, at *7.

Unlike the '608 Patent, claim 1 of the '075 Patent "is a pure method claim." [3] *ResQNet II*, 346 F.3d at 1383. Claim 1 of the '075 Patent is as follows:

The method of communicating between a host computer and a remote terminal over a data network comprising steps of:

 establishing a first communication session between said terminal and a communications server via a first communications channel;

 downloading, from said server to said terminal, communications software for communicating between said terminal and said host and a plurality of specific screen identifying information;

 utilizing said communications software to implement a second communications session between said terminal

---

process instead of reciting an element in precise detail." *ResQNet I*, 2002 WL 31002811, at *3 (citing 35 U.S.C. § 112, ¶ 6). "Ordinarily, a claim in that format covers only the corresponding structure disclosed in the written description, as well as that structure's equivalents." *ResQNet II*, 346 F.3d at 1379 (citing 35 U.S.C. § 112, ¶ 6; *Budde v. Harley-*

*Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed.Cir. 2001)).

**3.** In general, a method claim not tied to a particular device "must be interpreted to cover any process that performs the method steps." *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1312 (Fed.Cir.2002).

and said host via a second communications channel independent of said server;

receiving a screen from said host to said terminal;

if said received screen matches one of the plurality of specific screen identifying information, displaying a customized GUI screen; and

if said received screen does not match one of the plurality of specific screen identifying information, displaying a default GUI screen.

('075 Patent, col. 4, ll. 65–67; col. 5, ll. 1–19.)

While claim 1 of the '075 Patent requires an algorithm, *see ResQNet II*, 346 F.3d at 1377 ("The asserted claims—claim 2 of the '961 patent, claim 1 of the '608 patent, and claim 1 of the '075 patent—each require an algorithm that recognizes the screen based on the information downloaded from the mainframe to the PC."), the particular algorithm need not be of the type described in the '961 Patent. *See ResQNet II*, 346 F.3d at 1383–84. As employed in claim 1 of the '075 Patent, the phrase " 'a plurality of specific screen identifying information' " means "at least two pieces of specific screen identifying information." *Id.* at 1383. According to the Federal Circuit, "the presence of 'specific' connotes selected or particular. This phrase does not equate to 'all.' " [4] *Id.*

### The Facts

The facts are derived from the parties' eight initial and responsive Statements of Facts made pursuant to Local Civil Rule 56.1, as well as from the supporting materials submitted by the parties, to the extent that such materials were provided.[5] The facts are undisputed except as noted and do not constitute findings of fact by this Court.

### Patent Specifications And Prosecution History

According to Lansa, the '075 Patent specification shows that the language of claim 1 regarding the steps of matching the received screen to one of the plurality of specific screen identifying information, and displaying a customized or default GUI screen requires an algorithm that generates a unique screen identification ("ID") number. ResQNet disputes this point as contrary to the Federal Circuit's decision in *ResQNet II* and to the language of the '075 Patent. ResQNet raises similar objections to Lansa's assertion that the prosecution history of the '075 Patent confirms that the correct interpretation of the steps of matching one of the plurality of specific screen identifying information and displaying a GUI is through an algorithm that generates a unique screen ID number.

According to Lansa, the steps for "receiving a screen from said host to said

---

4. In reaching these conclusions, the Federal Circuit reversed this Court's earlier determination that the term "information" employed in claim 1 of the '075 Patent should be construed to be consistent with the use of that same term in the '961 Patent, "insofar as *all* fields on the screen are utilized." *ResQNet I*, 2002 WL 31002811, at *7 (emphasis supplied); *see ResQNet II*, 346 F.3d at 1384 (explicitly reversing "the construction of claim 1 of the '075 patent to the extent that it required the claimed method to include more than 'a plurality of specific screen identifying information' ").

5. Lansa has submitted two affidavits to which exhibits were purportedly attached in support of its motions for partial summary judgment submitted in September 2004. No such exhibits were found in a review of the Court record. Although certain of the materials cited were annexed to or included in other materials previously submitted in this action or were handed up at oral arguments, other documentary evidence, including relevant pages of the deposition testimony of Eamon Musallam and Dr. Eric M. Dowling, has not been located in the record.

terminal; if said received screen matches one of the plurality of specific screen identifying information, displaying a customized GUI screen; and if said received screen does not match one of the plurality of specific screen identifying information, displaying a default GUI screen" were added as a limitation during the prosecution history of the '075 Patent. ('075 Patent, col. 5, ll. 13–19.) ResQNet disputes this point as irrelevant.

The language "means for identifying, based upon a position, length and type of each of a plurality of fields, a particular screen to be displayed to said user" was a limitation that was added to claim 1 of the '608 Patent during its prosecution history. ('608 Patent, col. 4, ll. 42–44.)

***Prior Sale***

The '075 Patent was filed on July 10, 1997 and issued on September 25, 2001. One year prior to the filing date of the '075 Patent (the "critical date") is July 10, 1996. ResQNet is the owner of the '075 Patent. The only asserted claim of the '075 Patent is claim 1, which ResQNet alleges is infringed by Lansa's newlook product.

The newlook product is one of many computer programs available worldwide that facilitates terminal emulation. The product is designed to "graphically enable" existing computer applications. The newlook software allows storage of selected information as a record in a repository.

According to Lansa, Look Software Pty Ltd. ("Look Software") of Australia commenced development of the newlook software product in January 1995. ResQNet contests this point, asserting that there is no admissible evidence from which to ascertain what was done in 1995 or what features or functions any such system included. ResQNet further disputes Lansa's assertion that newlook is a comprehensive application program that allows terminal users to display green screen data from a host in GUI formats by enhancing the screen data, a process known as terminal emulation. According to ResQNet, it is unclear which version of newlook is being described and as of what date. Moreover, ResQNet asserts that the testimony of Marcus Dee of Look Software ("Dee"), offered by Lansa is support of these points, is inadmissible and uncorroborated. Finally, ResQNet asserts that the newlook software referenced in 1995 is drastically different from the newlook software at issue in this case. ResQNet cites no evidence on the record in support of this position.

Lansa asserts that the newlook software currently sold is the same software, and has operated in the same manner, as the software that was first offered for sale in the United States in 1996, including its use of dynamic recognition technology to display graphical screens and its ability to make customizations using the "Identify" tool which are applied when a "Screen ID" is matched. Lansa further asserts that newlook has remained the same product since its release in early 1996 but has been enhanced with additional features such as the "designer" feature, which allows a customer to add his or her own objects and images to a screen. ResQNet disputes that the newlook software sold in 1996 and the software presently sold are the same, and asserts that Lansa's testimony concerning what was sold in 1996 is inadmissible hearsay.

ResQNet disputes Lansa's assertion that the newlook product was advertised in the Asia/Pacific region in a publication entitled "News/4You" in March 1996 on the ground that there is no admissible evidence that sets forth the features or functions of the product advertised in 1996. According to Lansa, the March 1996 "News/4You" publication advertised that "NewLook DYNAMICALLY generates sophisticated, consistent Windows GUIs." (Declaration of

Marcus Dee, dated Apr. 5, 2004 ("Dee Decl."), at ¶ 11.[6]) The same publication, according to Lansa, included a working demonstration diskette containing the newlook program and encouraged the reader to "Install and run the NewLook demonstration to see samples of the varying screen styles NewLook supports." (*Id.*) ResQNet disputes this point, asserting that the publication in question contains no evidence as to whether the product contained the limitations of the claim in issue and that there is no admissible evidence as to the features present in any system advertised in 1996. Similar objections are raised to Lansa's assertion that the newlook software was offered for sale and sold in the Asia/Pacific region as early as March 1996 and that a copy of newlook was sold to Aspect Computing Pty Ltd in March 1996.

According to Dee, he offered the newlook software for sale to Steve Abbott, President and Chief Technical Officer of Speciality Insurance Services in Orange, California ("Abbott") on or around June 24, 1996. ResQNet disputes this point on the same grounds raised with relation to the Asia/Pacific advertisements and sales asserted by Lansa and further asserts that Dee's declaration is inadmissible, as Dee is an interested witness.

In a facsimile dated June 24, 1996, Dee asked Abbott to "please confirm [the order] by fax and send us a check for $US350." (Dee Decl., at ¶ 18 & Exh. F.) Included in the facsimile of June 24, 1996 was a ten-page overview of the newlook software which describes dynamic GUI generation, various alternatives to create GUIs for green screen applications, and the advantages of newlook software's technique for dynamic GUI generation, including reference to "an approach that reliably and instantly generates the user interface at runtime." (Dee Decl., at ¶ 20 & Exh. F.) The overview also describes the "Identify" and "Filters" features of the program that are used, according to Lansa, to define and apply customizations. As explained in the facsimile of June 24, 1996, dynamic GUI generation describes the way newlook software changes green screens into GUIs. ResQNet asserts that the details set forth in the facsimile and overview fail to show the steps in the claim at issue and thus do not anticipate the claim. ResQNet also asserts that it is unknown what was sold to Abbott.

Abbott responded to Dee by facsimile dated July 1, 1996, requesting that Dee send a copy of newlook to him as soon as possible. Abbott also wrote that his company was working on three very large opportunities with insurance companies and that a good GUI would enhance his company's position and could result in "many 100s of seats for NEWLOOK." (Dee Decl., at ¶ 24 & Exh. G.) On August 20, 1996, Speciality Insurance Services rendered a check for a single-user license for the newlook product. ResQNet disputes the relevance of these facts.

### The Operation Of Newlook

ResQNet disputes Lansa's assertion that newlook applies instantaneous analysis of green screen information and instantaneous generation of the GUI, resulting in dynamic and automatic, "on the fly" recognition and GUI format generation. Likewise, ResQNet disputes Lansa's assertion that, with newlook, any changes made to existing green screens are instantly reflected in the "just in time" generated GUI format on the end-user's PC and that newlook is not a static process, where a batch

---

**6.** While a page from the March 1996 "News/4You" publication has been submitted in connection with Lansa's motion, the page in question makes no explicit reference to the newlook software.

process is run before displaying GUI from a green screen.

According to Lansa, there is no batch process run before displaying GUI from a green screen with the newlook product. ResQNet disputes this point as irrelevant and asserts that unspecified newlook documents establish that a batch process is run before the green screen is displayed in order to determine which fields will be utilized to identify the screen.

According to Lansa, newlook operates using existing IBM standards and/or through a person manually selecting a field. ResQNet disputes this point and asserts that Lansa's documents and testimony establish that the system evaluates the position, length and type of predetermined fields in order to identify the screen after generating a screen ID. ResQNet cites no specific record evidence in support of its interpretation. ResQNet further asserts that the manual operation referred to by newlook is simply setting up the algorithm to be used by the computer in advance and that even the system in the '608 Patent requires such a process. ResQNet cites no record evidence in its Local Civil Rule 56.1 Statement in support of its interpretation.

According to Lansa, with the newlook product a received green screen is merely read to see if there is a match. In other words, newlook looks at a screen for a predetermined field on which to identify a field, and then makes a comparison between the field found and the defined override profile.[7] Certain of the evidence cited by Lansa in support of this proposition is not in the record. ResQNet disputes Lansa's assertion that the received green screen is merely read to see if there is a match and suggests that the received

screen is checked to determine the location and types of particular fields that have been preselected in order to uniquely identify the screen. ResQNet cites no specific record evidence in support of its interpretation.

According to Lansa, newlook does not employ an algorithm to generate a unique screen identification number. Certain of the evidence cited by Lansa in support of this proposition is not in the record. ResQNet, in turn, disputes this point, but cites no record evidence in support of its own interpretation.

### *Discussion*

### I. *The Motions for Partial Summary Judgment*

#### A. *The Summary Judgment Standard*

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co., Inc.,* 360 F.3d 329, 338 (2d Cir. 2004). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its

---

**7.** Although no definition of "defined override profile" is readily apparent in the documentary evidence in the record, the phrase appears to refer to the rules "defined" or customized by a user to override certain default settings or newlook's "recognition engine." (Declaration of Jeffrey I. Kaplan, undated, Exh. A, at LAN 000019.)

case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). If, however, " 'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.' " *Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82–83 (2d Cir.2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995). This burden may be satisfied "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir.2002) (internal quotation marks and citations omitted); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.").

In order to defeat a motion for summary judgment, the non-moving party must offer sufficient evidence to enable a reasonable jury to return a verdict in its favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.2001); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). In other words, the non-moving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto*, 143 F.3d at 114–15.

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) ("[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment."). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir.2002).

**B. *Lansa's Motion for Partial Summary Judgment of Invalidity And ResQNet's Motion To Strike The Invalidity Defense Are Denied***

Lansa has moved for partial summary judgment as to the '075 Patent on the ground that the '075 Patent is invalid under 35 U.S.C. § 102(b). Lansa contends that undisputed facts show that newlook was on sale in the United States prior to the '075 Patent's critical date, July 10, 1996, thus rendering the '075 Patent inval-

id. Solely for purposes of this motion relating to the "on-sale" defense, Lansa has conceded infringement of the '075 Patent. *See Vanmoor v. Wal–Mart Stores, Inc.,* 201 F.3d 1363, 1366 (Fed.Cir.2000).[8]

ResQNet has contended that the prior art does not include the limitations of the claim at issue. ResQNet has also cross-moved to strike the invalidity defense asserted by Lansa as to the '075 Patent on the ground that a patent may not be deemed invalid based merely upon the uncorroborated testimony of an interested witness. According to ResQNet, Dee, upon whose testimony Lansa has relied in support of its argument for invalidity, should be precluded from testifying at trial, as Dee's testimony is the "sole proof" offered as to the nature of the purported prior art and permitting his uncorroborated testimony would "merely cause confusion." (Pl. Apr. 27, 2004 Mem. at 9.)

■ Under 35 U.S.C. § 102(b),[9] a patent is invalid if the purported invention it describes was in public use and on sale more than one year prior to the filing of the patent application, a date known as the critical date. *See Scaltech, Inc. v. Retec/Tetra, L.L.C.,* 269 F.3d 1321, 1327–28 (Fed.Cir.2001) (explaining the nature of a critical date). Thus, prior to the critical date, (1) "the product must be the subject of a commercial offer for sale" and (2) "the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998).

■ With respect to this first condition, "[a]n offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Group One, Ltd. v. Hallmark Cards,* 254 F.3d 1041, 1048 (Fed.Cir. 2001), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1063, 151 L.Ed.2d 967 (2002). As to the second condition, an invention is considered "ready for patenting" when it has been reduced to practice prior to the critical date, or there are specifications or other descriptions of the invention that enable a person of skill in the art to practice the invention. *See Pfaff,* 525 U.S. at 67–68, 119 S.Ct. 304; *see also Vanmoor,* 201 F.3d at 1366. A party challenging the validity of a patent pursuant to § 102(b) must demonstrate the applicability of the on-sale bar with clear and convincing evidence. *See Poly–America, L.P. v. GSE Lining Tech., Inc.,* 383 F.3d 1303, 1308 (Fed.Cir. 2004); *Abbott Labs. v. Geneva Pharms., Inc.,* 182 F.3d 1315, 1318 (Fed.Cir.1999).

In general, an accused infringer bears the burden of proving that the device sold prior to the critical date in question anticipated the patent claim. *See Poly–America,* 383 F.3d at 1309; *Abbott Labs.,* 182 F.3d at 1318; *Evans Cooling Sys., Inc. v. General Motors Corp.,* 125 F.3d 1448, 1451 (Fed.Cir.1997). Where, however, the patentee has alleged that the device in question infringed its patent and the accused

**8.** In a footnote, Lansa argues that, as a result of *ResQNet II,* in which the Federal Circuit affirmed this Court's *Markman* construction of the '961 Patent, the summary judgment previously granted as to that patent should be reentered. Lansa further asserts that ResQNet should be "forever barred" from claiming that the other patents-in-suit and claims are infringed as a result of the Consent Judgment entered in this case. (Def. Apr. 6, 2004 Mem. at 1 n.1; *see also* Def. Aug. 20, 2004 Mem. 1 n.1.) As neither argument has been

otherwise developed or briefed by Lansa, the issues raised are not ripe for decision.

**9.** Subsection 102(b) of Title 35 provides that a person is not entitled to a patent if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...." 35 U.S.C. § 102(b).

infringer has conceded that infringement for purposes of a § 102(b) defense, the accused infringer's burden is satisfied. *See Vanmoor*, 201 F.3d at 1366; *Evans Cooling Sys.*, 125 F.3d at 1451.

There is no dispute that a product was offered for sale under the name "newlook" prior to the critical date of the '075 Patent. Relying on the rule articulated in *Evans Cooling Systems* and *Vanmoor*, Lansa argues that it has satisfied its burden of demonstrating that the newlook software sold in 1996 anticipates claim 1 of the '075 Patent because ResQNet has alleged that newlook infringes the '075 Patent. Thus, according to Lansa, it need not show that one using the newlook software would practice each step in claim 1 of the '075 Patent in order to establish its on-sale defense. ResQNet argues that there is nothing beyond Dee's testimony to establish that the newlook product offered for sale prior to the '075 Patent's critical date is the same product that is alleged to infringe the '075 Patent.

In both *Evans Cooling Systems* and *Vanmoor*, the products on sale prior to the critical date were the same as the products alleged to infringe the plaintiffs' patents.[10] As one court has recently explained, the plaintiffs in *Evans Cooling Systems* and

*Vanmoor* "held no viable causes of action for infringement unless they could prove infringement of devices that were on sale before the respective critical dates;" in sum, "the substance of their allegations implicated only prior art." *IXYS Corp. v. Advanced Power Tech., Inc.*, No. 02 Civ. 3942(MHP), 2004 WL 540513, at *6 (N.D.Cal. Mar.18, 2004) (concluding that "[t]he logical nexus that existed between infringement and invalidity in *Evans Cooling*" was not present where the plaintiff patentee could succeed on its claim without proving that the product alleged to be on sale prior to the critical date itself infringes the patent).

■ By contrast, the amended complaint in this action alleges that Lansa began producing, offering for sale and selling various items that infringe ResQNet's patents "[l]ong after" ResQNet invented and applied for patent protection as to its technologies. (Am. Compl. at ¶ 8.) Although ResQNet has alleged that Lansa's "infringing products are believed to include at least those sold under the name Newlook" (Am. Compl. at ¶ 9), there is no allegation that the newlook product alleged to infringe "[l]ong after" ResQNet's application for patent protection is the same product assertedly on sale prior to the '075

10. In *Evans Cooling Systems*, the Federal Circuit held that the accused infringer had met its burden on an on-sale defense by conceding the patentee's allegation of infringement where "the entire basis of the lawsuit is Evans'—the patentee's—contention that the LT1 engine—*the device that was put on sale*—contains a cooling system that infringes." *Evans Cooling Sys.*, 125 F.3d at 1451 (emphasis supplied). In other words, "the product that allegedly triggered the on-sale bar, an automobile engine with a particular cooling system, was precisely the same product that was alleged by the plaintiff to infringe the patent-in-suit." *Process Res. Corp. v. Delta Air Lines, Inc.*, No. 98 Civ. 5648(JGK), 2000 WL 145114, at *7 (S.D.N.Y. Feb.3, 2000) (discussing *Evans Cooling Systems*). Likewise, in *Vanmoor* the Federal Circuit concluded that the defendants had sustained their burden of proving that their pre-critical date sales of certain cartridges anticipated the subject patent where "the pre-critical date sales were of completed cartridges made to specifications that remain unchanged to the present day, showing that any invention embodied in the accused cartridges was reduced to practice before the critical date." *Vanmoor*, 201 F.3d at 1365–67 (noting that the defendants had supported their motion for summary judgment with affidavits and documentary evidence "showing that the manufacturing specifications, component dimensions, and methods of operation of at least three of the accused cartridges were identical to those manufactured, used, and sold prior to the critical date").

Patent's critical date. As a result, the amended complaint, on its own, provides an insufficient basis from which to conclude that Lansa has satisfied its burden of proving that the use of the newlook software offered for sale in 1996 anticipates claim 1 of the '075 Patent. Notwithstanding this conclusion, however, if there is no genuine issue of material fact as to whether the newlook product offered for sale in 1996 is the same as the newlook product alleged to infringe the '075 Patent, the application of the rule set forth in *Evans Cooling Systems* and *Vanmoor* would appear mandated. Simply put, to prevail on its motion for partial summary judgment as to the invalidity of the '075 Patent, Lansa must demonstrate that no genuine issue of material fact exists as to whether the accused version of newlook is materially identical to that offered for sale in 1996.

Dee has testified that the newlook software currently sold is the same software and operates in the same manner as the newlook software offered for sale in the United States in 1996. In addition, Lansa points to documents describing how the newlook software presently available operates and to the description of the newlook software included in the facsimile dated June 24, 1996 sent by Dee to Abbott as further demonstrating that the software alleged to infringe and that offered for sale in 1996 are materially identical.

Although certain similarities between the 1996 and accused versions of newlook are apparent based on a comparison of the documentary evidence submitted, the record does not clearly demonstrate that the newlook product offered for sale in 1996 is materially identical to the newlook product accused by ResQNet. For instance, and notwithstanding the documentary evidence submitted by Lansa in a supplemental filing in September 2004, it is not evident whether the 1996 incarnation of newlook employed a server or communications channels in the same manner as the accused version of newlook, material features in view of the three computer host-server-terminal arrangement recited in the claim of the '075 Patent allegedly infringed by the present version of newlook.

■ Drawing all reasonable inferences in ResQNet's favor, *see Gibbs–Alfano,* 281 F.3d at 18, it may not be determined based upon the current record that the newlook product offered for sale in 1996 is materially identical to the newlook product accused by ResQNet. Accordingly, Lansa's motion for partial summary judgment as to the invalidity of the '075 Patent must be denied based on the presence of genuine issues of material fact as to whether the product offered for sale by Lansa in 1996 is materially identical to the product sold in 2001 and alleged to infringe the '075 Patent.[11]

■ ResQNet's motion to strike the invalidity defense and preclude Dee from testifying about the defense at trial is likewise denied. As ResQNet correctly notes, under the law of the Federal Circuit, a party may not establish an on-sale bar solely by reliance on uncorroborated testimony. *See Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1367 (Fed.Cir. 1999); *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1371 (Fed. Cir.1998). In accordance with this principle, oral testimony offered in support of a

---

11. Lansa has argued that ResQNet failed to raise a genuine issue of material fact insofar as it did not put forth any evidence that the 1996 software is materially different from the software accused by ResQNet. Even when a party opposing summary judgment fails to offer evidence to counter that set forth by the movant, however, the motion may nonetheless be denied "where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." *See Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (internal quotation marks and citation omitted).

§ 102(b) argument may be excluded if it is offered without any corroborating evidence. *See, e.g., Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1217–18 (Fed.Cir.2002) (holding that, "[i]n the absence of further contemporaneous corroborating evidence, we are unable to conclude that the district court abused its discretion in refusing to admit Brown's testimony for lack of corroboration"), *cert. denied,* 538 U.S. 1058, 123 S.Ct. 2230, 155 L.Ed.2d 1108 (2003).

Lansa has not relied solely on Dee's testimony but has also invoked certain contemporaneous documentary evidence in support of its argument for invalidity of the '075 Patent. ResQNet argues that the documentary evidence proffered is insufficient to corroborate Dee's testimony, as the documents proffered by Lansa fail to set forth the presence of the first three limitations of claim 1 in the 1996 newlook product. Because ResQNet's motion does not address the documentary evidence contained in Lansa's supplemental submission filed on September 28, 2004, ResQNet's motion is denied at this time, with leave granted to renew the motion as an *in limine* motion prior to trial.[12]

C. *Material Facts Preclude Summary Judgment As To Whether Lansa's Newlook Product Infringes the '075 Patent*

ResQNet has moved for partial summary judgment of liability on the ground that Lansa's newlook product infringes claim 1 of the '075 Patent. ResQNet argues that Lansa has failed to identify any single claim limitation absent from its product. In response, Lansa has cross-moved for partial summary judgment of non-infringement of the '075 Patent, arguing that Lansa's newlook product neither literally infringes claim 1 of the '075 Patent nor infringes claim 1 under the doctrine of equivalents. Both motions hinge on whether an algorithm that generates a unique screen identification number is an essential element of ResQNet's invention and whether such an algorithm is employed by Lansa's newlook product.

 "Determination of patent infringement requires a two-step analysis: (1) the scope of the claims must be construed; and (2) the allegedly infringing device must be compared to the construed claims." *Mars, Inc. v. H.J. Heinz Co.,* 377 F.3d 1369, 1373 (Fed.Cir.2004); *accord PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.,* 355 F.3d 1353, 1357 (Fed.Cir. 2004). In construing claims, a court looks first to intrinsic evidence, including the words of the claims themselves, the patent specification, and the prosecution history of the patent. *See W.E. Hall Co. v. Atl. Corrugating, LLC,* 370 F.3d 1343, 1350 (Fed.Cir.2004) (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)). Intrinsic evidence should be examined first, as it is "the most significant source of the legally operative meaning of disputed claim language." *Vitron-*

---

12. ResQNet has also argued that the oral testimony of an interested witness may not establish invalidity under any circumstances. This proposition is not supported by the cases cited by ResQNet. To the contrary, the Federal Circuit has expressly held that the corroboration requirement exists regardless of the degree of interest of the witness at issue. *See Finnigan,* 180 F.3d at 1367 ("[T]he need for corroboration exists regardless [of] whether the party testifying concerning the invalidating activity is interested in the outcome of the litigation (*e.g.,* because that party is the accused infringer) or is uninterested but testifying on behalf of an interested party.... Uninterested witnesses are also subject to the corroboration requirement."); *see also Texas Digital Sys.,* 308 F.3d at 1217 ("Corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest."). Accordingly, Dee's testimony will not be precluded solely on the basis of his purported interest in the present litigation.

*ics,* 90 F.3d at 1582. In this regard, a patent's specification is usually " 'dispositive' " where the language of a claim is in dispute, as the specification " 'is the single best guide to the meaning of a disputed term.' " *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1268 (Fed.Cir.2001) (quoting *Vitronics,* 90 F.3d at 1582). Reliance on extrinsic evidence, including expert testimony, is only appropriate when the intrinsic evidence does not resolve an ambiguity in a disputed claim term or when the court requires assistance in learning the technical aspects of the relevant art. *See DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1323 (Fed.Cir.2001); *EMI Group N. Am., Inc. v. Intel Corp.,* 157 F.3d 887, 892 (Fed.Cir.1998); *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 706 (Fed.Cir.1997).

 Lansa argues that partial summary judgment of non-infringement is appropriate both for want of literal infringement and under the doctrine of equivalents. With regard to the first argument, summary judgment as to literal infringement is appropriate only "when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir.1998). As to Lansa's second argument, "[i]nfringement under the doctrine of equivalents requires that the accused product contain each limitation of

the claim or its equivalent." *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,* 285 F.3d 1353, 1358–59 (Fed.Cir.2002) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). "A claim element is equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device." *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423 (Fed.Cir.1997). Thus, under the doctrine of equivalents, summary judgment of noninfringement is proper where "no reasonable jury could determine two elements to be equivalent." *Leggett & Platt,* 285 F.3d at 1360 (quoting *Warner–Jenkinson,* 520 U.S. at 39 n. 8, 117 S.Ct. 1040).

 The Federal Circuit reversed the construction of claim 1 of the '075 Patent from *ResQNet I,* but only "to the extent that it required the claimed method to include more than 'a plurality of specific screen identifying information.' " *ResQNet II,* 346 F.3d at 1384. The Federal Circuit otherwise made clear that "[t]he asserted claims"—including claim 1 of the '075 Patent—"each require an algorithm that recognizes the screen based on the information downloaded from the mainframe to the PC." [13] *Id.* at 1373. In so ruling, the Federal Circuit appears to have implicitly construed claim 1 of the '075 Patent by reference to the specification, since the term "algorithm" is not included in the element language of claim 1.[14]

---

**13.** According to the Federal Circuit, the '075 Patent specification discloses that " '[t]he particular screen recognition algorithm used is *not critical* to the present invention but *may* be of the type described in the '961 patent.' " *ResQNet II,* 346 F.3d at 1383 (citation omitted and emphasis in original). In other words, although claim 1 of the '075 Patent requires an algorithm, the algorithm used need not be

of the type described in the '961 Patent. *See id.* at 1383–84.

**14.** The absence of a term in the claim language itself does not preclude a court from interpreting the claim language to include such a limitation. Thus, in *Alloc, Inc. v. International Trade Commission,* 342 F.3d 1361 (Fed.Cir.2003), *cert. denied,* 541 U.S. 1063, 124 S.Ct. 2390, 158 L.Ed.2d 963

The relevant intrinsic evidence as well as ResQNet's own representations and admissions support this construction, and demonstrate that an algorithm is required by the "match[ing]" process described in the fifth limitation of claim 1, which limitation explains the result where "said received screen *matches* one of the plurality of specific screen identifying information." ('075 Patent, col. 5, ll. 14–15 (emphasis supplied).) Thus, the summary of the invention, part of the written description of the '075 Patent, sets forth the matching process as follows:

> [A]s host screens are downloaded to the terminal emulator, the terminal emulator performs the screen recognition algorithm, and sends the results to the server. The server then returns to the terminal emulator the appropriate parameters for displaying the screen in GUI format.

('075 Patent, col. 2, ll. 28–32.) The matching process is described in somewhat more detail elsewhere in the specification, once again underscoring the role played by an algorithm to make possible the match in question:

> Once the communications connection is established, screens of information, depending upon the particular application being run, will be downloaded from host 102 to NC terminal 104. These screens of information are waited for at block 205 by the NC terminal 204. The

screen of information is then placed into a presentation space of operation box 206 and it is recognized using a screen recognition procedure at block 207. The particular screen recognition algorithm used is not critical to the present invention but may be of the type described in the '961 patent.

> After the screen is recognized and a screen ID is generated, the decision point 208 determines whether or not such screen is contained in the screen table at the server.

('075 Patent, col. 4, ll. 1–13.) ResQNet itself has acknowledged that an algorithm is called for by claim 1, explaining in opposition to Lansa's motion that "a simple matching algorithm . . . will suffice to meet the language of the claim. . . ." [15] (Pl. Sept. 17, 2004 Opp. Mem. at 2.)

 While an algorithm may be integral to claim 1 of the '075 Patent, ResQNet nonetheless argues that the language of claim 1 does not call for an algorithm that generates a screen identification number, as Lansa has suggested. The language of the specification belies this conclusion. In particular, the specification teaches that, whichever algorithm is employed, the application of that algorithm invariably produces a unique identification number:

> During the implementation of a particular application, host 102 downloads a variety of different screens. These

(2004), the Federal Circuit explained that "where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims." *Alloc*, 342 F.3d at 1370 (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed.Cir. 2001)). The *Alloc* court concluded that the claims at issue in that action were subject to a "play" limitation, notwithstanding the absence of the term "play" from the claim language, where the claims in question recited features in which play was necessarily present

and the specification taught that play enabled "displacement" and "disassembly," both explicit claim terms. *See id.* at 1368–70.

15. Similarly, ResQNet's expert witness has interpreted the matching element of claim 1 as depending upon application of an algorithm: "A screen recognition algorithm is applied to the screen to determine whether the information matches the screen. If the screen agrees with the downloaded information, then a customized GUI is used." (Declaration of Jeffrey I. Kaplan, undated, Exh. F, at 4–5.)

green screens, as they are called, are processed through screen recognition algorithms such as that described in the previously incorporated '961 patent and '583 application. *The processing of each screen generates a unique identification number.* ('075 Patent, col. 3, ll. 39–45 (emphasis supplied).) Following the generation of a unique identification number by the processing of each screen by a screen-recognition algorithm, a table of unique identification numbers previously downloaded from the server is "utilized to ascertain the tag from the *unique* identifier." ('075 Patent, col. 3, ll. 45–46 (emphasis supplied).) This table, as the specification elsewhere notes, contains *"the unique identification numbers which will be generated* by each screen downloaded from the host *when the screen recognition algorithms* of the '961 Patent, or other such screen recognition algorithms, *are executed."* ('075 Patent, col. 3, ll. 13–17 (emphasis supplied).) Simply put, the execution of the screen-recognition algorithms required by claim 1 generates unique identification numbers, and this description of the algorithm's function limits the scope of claim 1. *See Alloc, Inc. v. Int'l Trade Comm'n,* 342 F.3d 1361, 1370 (Fed.Cir.2003) (stating that, "where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply," such as where "the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment," it is "entirely permissible and proper to limit the claims").[16]

The prosecution history for the '075 Patent does not suggest a contrary conclusion.

As originally filed, the application for what later became the '075 Patent initially contained claims directed to a "three-way" communications system among a terminal, server and a remote host, as a part of which system the terminal would download different screens of information from the host and, upon receiving the screen, according to the applicants' description, "either read[ ] a screen ID sent by the host or generate[ ] its own screen ID" subsequently transmitted to the server. (Affidavit of James H. Hulme, sworn to Sept. 17, 2004 ("Sept. 17 Hulme Aff."), Exh. B, at ZEP 12846 (explaining that the server would then send the terminal information "indicative of how to display the information downloaded from the host").) Upon initial examination by the United States Patent and Trademark Office (the "PTO"), all of the claims were rejected as being anticipated by U.S. Patent No. 5,754,830 (the " '830 Patent").

The applicants subsequently sought to distinguish their proposed claims from the '830 Patent, once again offering a brief review of the invention claimed:

Applicant's invention relates to a technique of utilizing a remote server in order to assist in presenting a graphical user interface (GUI) to a user. In operation, software from a communications server is downloaded to a terminal. The software is specifically designed to allow communications between the terminal and a remote host. A second communications channel is then established between the terminal and the remote host. . . .

In claim 3, the server is also used in order to assist in presentation of the

---

**16.** Unlike the permissive and equivocating terms " 'may,' " " 'not critical,' " and " 'such as' " in view of which the Federal Circuit held that no specific algorithm was required by the '075 Patent, *ResQNet II,* 346 F.3d at 1383–84, the language of the specification, which describes how the algorithm in question functions, contains no such signals of preference or possibility.

information downloaded from the server. For example, *the screen ID which is generated at the terminal in response to receiving a screen of information* is decoded and sent to the server. The server then interprets the particular screen ID, utilizes a table lookup or other mechanism in order to determine how to present the screen of information as a graphical user interface, and then sends the presentation information to the terminal.

(Sept. 17 Hulme Aff., Exh. B, at ZEP 12872–73 (emphasis supplied).) The applicants argued that the '830 Patent did not teach the decoding of each screen of information at the terminal and the subsequent transmittal of the "decoded scree[n] ID to a remote server in order to have the remote server specify the GUI presentation for each screen." (Sept. 17 Hulme Aff., Exh. B., at ZEP 12874.) The PTO once again rejected the proposed claims, noting that the applicants had not claimed the limitation of decoding screen information at the terminal and transmitting a decoded screen ID in order to specify a particular GUI.

Subsequent amendments setting forth the limitation of decoding screen information, including decoding screen ID information, at the terminal were likewise rejected by the examiner. It was only upon adding the final three limitations of present claim 1 that the application was allowed. As the applicants explained upon presenting the new limitations,

> The amendment to the claims has added limitations directed to a selection of a GUI screen that may be customized in the circumstance that the screen received from the host matches one of a plurality of screen identifying information, or, alternatively may be a default GUI screen if the received screen from the host does not so match. *This unique limitation derives from the specification* at page 7 line 23 through page

8, line 26, which describes the flowchart of figure 2 of the application.

(Sept. 17 Hulme Aff., Exh. B, at ZEP 12922–23 (emphasis supplied).) The portions of the specification to which the applicants referred and from which the "unique limitation derives" are the same portions of the specification, previously described, which set forth the use of an algorithm to perform a "screen recognition procedure," upon the performance of which "a screen ID is generated." ('075 Patent, col. 4, ll. 1–13.) Thus, the prosecution history of the '075 Patent provides further confirmation that claim 1 and, in particular, the matching process claimed therein are to be construed to require use of an algorithm that generates screen IDs.

ResQNet argues that this construction runs contrary to the holding of *ResQNet II*, insofar as the Federal Circuit ruled that claim 1 of the '075 Patent does not require that the particular screen-recognition algorithm employed be of the type described in the '961 Patent. This argument must be rejected. According to the Federal Circuit, the '961 Patent requires an algorithm which evaluates all of the fields of an incoming screen of data in order to uniquely identify the incoming screen. *See ResQNet II*, 346 F.3d at 1379–82. In other words, the '961 Patent does not simply describe an algorithm that generates unique screen IDs, but one that "requires use of *every field* in the information downloaded from the mainframe to the PC in determining a screen ID." *Id.* at 1382 (emphasis supplied). To construe claim 1 of the '075 Patent to require an algorithm that generates a unique screen ID, without regard to how that screen ID is generated or from what data it is derived, does not, therefore, run contrary to the Federal Circuit's holding that the '075 Patent need not employ the type of algorithm described in the '961 Patent. Nor, for that matter, does this construction contradict ResQNet's argument that even a

prior art algorithm could be employed by the method claimed in the '075 Patent.

ResQNet has also argued that construing claim 1 to require an algorithm that generates a unique screen ID would render the language "generating a screen ID" superfluous in the claims in which it is contained, such as the claims of the '961 Patent, and would impermissibly read limitations of the '961 Patent into the '075 Patent. As there is "no reason to construe the '075 claims as identical to similar claim terms in the other two patents," including the '961 Patent, *ResQNet II*, 346 F.3d at 1383, ResQNet's argument concerning superfluity and parallel construction is unconvincing. Furthermore, for the reasons set forth above, the requirements of claim 1 of the '075 Patent described herein are not being read into the claim from the '961 Patent but, rather, are required in light of the ruling of the Federal Circuit, the specification and the relevant prosecution history.

■■■ As claim 1 requires an algorithm that generates a screen ID in order to perform the "match[ ]" described in the fifth limitation to the claim, the next question is whether Lansa's newlook product infringes the claim so construed. According to ResQNet, the newlook product contains each of the limitations of claim 1, including, as ResQNet argues in the alternative,[17] the requirement of an algorithm that generates screen IDs. ResQNet cites the testimony of Lansa's technical witness

for the proposition that newlook employs so-called rules to generate GUIs, and points to a variety of documentary evidence concerning newlook which make reference to screen IDs. Lansa, in turn, has cited both documentary and testimonial evidence for the proposition that newlook does not generate a unique screen ID as required by the claim. Drawing necessary inferences against the moving party as to each of the two motions, *see Gibbs–Alfano*, 281 F.3d at 18, and in view of the incompleteness of the record,[18] both motions for partial summary judgment as to the '075 Patent are denied. The existence of genuine issues of material fact as to whether newlook infringes the '075 Patent by, *inter alia*, employing an algorithm to generate screen IDs precludes judgment as a matter of law.

### D. *Lansa's Motion for Partial Summary Judgment of Non–Infringement of the '608 Patent Is Denied*

Lansa has moved for partial summary judgment of non-infringement of the '608 Patent on the ground that the '608 Patent, and in particular the second limitation of claim 1 of the '608 Patent, is properly construed as employing an algorithm to generate a screen identification number, and newlook does not generate such a screen identification number. Accordingly, Lansa contends that newlook does not infringe the '608 Patent. ResQNet does not dispute Lansa's characterization of the '608 Patent [19] but argues that the testi-

---

17. In its reply brief, Lansa has made much of the representation contained in ResQNet's moving papers that it is "ridiculous to hold a trial so Lansa can attempt to prove that it does not use a screen ID generator algorithm, not required by the claims, because ResQ[N]et will stipulate to that ... for purposes of this motion." (Pl. Aug. 19, 2004 Mem. at 12.) As ResQNet subsequently opposed Lansa's motion by arguing in the alternative that newlook employs an algorithm that generates a screen ID, the offer to stipu-

late contained in ResQNet's moving papers provides an insufficient basis upon which to rest summary judgment.

18. *See supra* note 5.

19. In opposition to Lansa's motion, ResQNet has described the structure disclosed in the '608 specification as "an algorithm for analyzing the downloaded information to generate a screen ID." (Pl. Sept. 17, 2004 Opp. Mem. at 4.)

mony of Lansa's witnesses demonstrates that newlook generates a screen ID by operation of a pattern-matching algorithm.

Claim 1 of the '608 Patent, which is a continuation-in-part of the '961 Patent, "require[s] an algorithm that recognizes the screen based on the information downloaded from the mainframe to the PC." *ResQNet II*, 346 F.3d at 1376. As the Federal Circuit has explained,

> Similar to claim 1 of the '961 patent, claim 1 of the '608 patent contains limitations in means-plus-function format. The claimed function is "identifying ... a particular screen to be displayed to said user." '608 patent, col. 4, ll. 42–44. The specification sets forth the corresponding structure: "Upon a screen of information being downloaded to a personal computer 103, the personal computer analyzes the screen with respect to the location of particular fields, and other attributes thereof, in order to recognize the particular screen downloaded." *Id.* at col. 2, ll. 51–55. Thus, similar to the '961 patent, the structure is an algorithm for analyzing the downloaded information to generate a screen ID.

*Id.* at 1382. The generation of a screen ID by the algorithm in question requires "use of a plurality of specific individual fields, i.e., at least two fields." *Id.* at 1383, 1384 (reversing this Court's construction of claim 1 of the '608 Patent "to the extent that it required the algorithm to use more than 'each of a plurality of fields' "). As was explained in *ResQNet I,* "the language of the claim itself makes clear that, unlike the '961 patent, the algorithm is dependent on three parameters for identifying a screen: position, length, and type." *ResQNet I,* 2002 WL 31002811, at *7.

■ For a means-plus-function claim such as claim 1 of the '608 Patent, literal infringement generally requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification. *See, e.g., Ishida Co., Ltd. v. Taylor,* 221 F.3d 1310, 1316 (Fed.Cir.2000) ("Literal infringement of a claim with a means-plus-function clause requires that the accused device perform a function identical to that identified in the means clause."); *Valmont Indus., Inc. v. Reinke Mfg. Co.,* 983 F.2d 1039, 1042 (Fed.Cir. 1993) ("In sum, for a means-plus-function limitation to read on an accused device, the accused device must employ means identical to or the equivalent of the structures, material, or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims."). Where, however, a dependent claim was rewritten into independent form and the original independent claims were cancelled, surrendering subject matter that was originally claimed for reasons related to patentability, the resulting narrowing amendment gives rise to a rebuttable presumption of surrender of equivalents and to prosecution history estoppel. *See generally Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 733–41, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002); *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,* 370 F.3d 1131, 1139–44 (Fed.Cir.2004), *petition for cert. filed,* 73 U.S.L.W. 3146, 2004 WL 1950434 (U.S.2004) (No. 04–293).

■ "Whether a patentee is presumptively estopped from asserting equivalents for an amended claim element is a question of law...." *Honeywell Int'l,* 370 F.3d at 1139. The "surrendered subject matter is defined by the cancellation of independent claims that do not include a particular limitation and the rewriting into independent form of dependent claims that do include that limitation." *Id.* at 1144. Equivalents, as the Federal Circuit has stated, "are presumptively not available

with respect to that added limitation." *Id.; see also Toro Co. v. White Consol. Indus. Inc.,* 383 F.3d 1326, 1331 (Fed.Cir. 2004) (explaining that, under the doctrine of prosecution history estoppel, "resort to the doctrine of equivalents is precluded based on actions of the patentee during prosecution evincing a surrender ... of subject matter").

Thus, in *Ranbaxy Pharmaceuticals, Inc. v. Apotex, Inc.,* 350 F.3d 1235 (Fed.Cir. 2003), the Federal Circuit concluded that there had been a narrowing amendment giving rise to a presumptive surrendering of equivalents, explaining that:

> While Apotex was merely rewriting a dependent claim into independent form, the effect on the subject matter was substantial. The dependent claims that were redrafted into independent form did more than simply add an additional limitation; they further defined and circumscribed an existing limitation for the purpose of putting the claims in condition for allowance. The additional language limited "highly polar solvent" [a phrase used in the original base claim rejected by the United States Patent and Trademark Office] to a defined group of solvents; sulfoxides, amides, and formic acid. In so doing, the patentee is presumed to have surrendered the equivalents that may have been encompassed by "highly polar solvent."

*Ranbaxy Pharms.,* 350 F.3d at 1240–41. The Federal Circuit likewise concluded that there was a presumption of prosecution history estoppel in *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.,* 347 F.3d 1314 (Fed.Cir.2003), *cert. denied,* 540 U.S. 1184, 124 S.Ct. 1426, 158 L.Ed.2d 88 (2004), observing that:

> Original claim 1 claimed "a sliding weight movably carried by said beam for

movement along said scale." In response to the examiner's rejection under 35 U.S.C. § 103(a), the applicants deleted original claims 1 and 3 and settled for claims containing the narrower requirement that a portion of the sliding weight be disposed substantially in a plane defined by the fulcrums originally present in claim 3. The territory between the sliding weight limitation of original claim 1 and the Zero Position Limitation [listed in the original dependent claim 3] was thus surrendered by the patentees.

*Deering Precision Instruments,* 347 F.3d at 1325. Finally, in *Honeywell International Inc. v. Hamilton Sundstrand Corp.,* 370 F.3d 1131 (Fed.Cir.2004), the Federal Circuit held that there had been a presumptive surrender of all equivalents of a specific limitation to certain patent claims involving a gas turbine engine, explaining that:

> The only independent claims asserted in this case, claims 4, 8 and 19, were originally dependent on independent application claims 16, 32, 48 and 49, which did not include the inlet guide vane limitation. Claims 4, 8 and 19 included the inlet guide vane limitation. Claims 4, 8 and 19 were rewritten into independent form, and the original independent claims were cancelled, effectively adding the inlet guide vane limitation to the claimed invention. Honeywell is presumptively estopped from recapturing equivalents to the inlet guide vane limitation.

*Honeywell Int'l,* 370 F.3d at 1144.

■■■ The prosecution history for the '608 Patent demonstrates that a narrowing amendment was made to the original claims in response to a rejection, giving rise to a presumption of surrender and estoppel.[20] Thus, as originally filed, the

---

20. "In general, prosecution history estoppel ... requires that patent claims be interpreted in light of the proceedings before the [United States Patent and Trademark Office]." *Deering Precision Instruments,* 347 F.3d at 1325.

application for what is now the '608 Patent contained six claims, including the following three:

1. Apparatus for implementing a computer terminal to be connected to a remote computer, said apparatus comprising:

means for identifying a particular user logged on to said remote computer through said computer terminal;

means for identifying a particular screen to be displayed to said user; and

a plurality of special function keys, each key performing a specified function, the specified function performed by each key being determined by the particular user logged on and the particular screen identified to be displayed.

2. Apparatus of claim 1 wherein said means for identifying includes means for generating a screen ID based upon a plurality of fields to be displayed on said screen.

3. Apparatus of claim 2 wherein the screen ID is based upon the position, length, and type of each of said plurality of fields.

(Appendix B to Lansa's Claim Construction Brief, Exh. C, at 10.) As the Federal Circuit explained in *ResQNet II*, in the "first and only" action by the PTO with respect to the application that matured into the '608 Patent,

[T]he examiner rejected all claims for obviousness-type double patenting over claims 1 to 3 of the '961 patent and rejected all claims, save one, as obvious over various prior art references. In response, the patentee issued a terminal disclaimer and rewrote the allowable claim in independent form including all limitations of the base and intervening claims.

*ResQNet II*, 346 F.3d at 1383. The claim deemed allowable if rewritten was the original claim 3, describing an apparatus "wherein the screen ID is based upon the position, length, and type of each of said plurality of fields." (Appendix B to Lansa's Claim Construction Brief, Exh. C, at 10.) As the amendment effectively added the limitation of original claim 3 to the claimed invention, ResQNet is presumptively estopped from recapturing equivalents to the position-length-and-type limitation now contained in the second limitation of claim 1 of the '608 Patent. *See Honeywell Int'l*, 370 F.3d at 1144.

A patentee may rebut the presumption of prosecution history estoppel by showing:

that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment, that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was some other reason suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir.2003) (internal quotation marks and citation omitted), *cert. denied*, 541 U.S. 988, 124 S.Ct. 2018, 2018–19, 158 L.Ed.2d 492 (2004); *accord Honeywell Int'l*, 370 F.3d at 1144. ResQNet has made no such showing here, instead simply arguing that means-plus-function claims invariably cover the structure disclosed in the specification and the equivalents thereof, without reference to Lansa's argument that prosecution history estoppel applies. Accordingly, the presumption of surrender has not been rebutted, and ResQNet is estopped from claiming equivalents that may have been encompassed in the broader claim language surrendered in light of the narrowing amendment.

Notwithstanding the narrowing amendment just described and the impact of prosecution history estoppel on ResQNet's infringement claim, Lansa's motion for partial summary judgment of non-infringement of the '608 Patent may not be granted at this time. As was the case in the context of the parties' motion for partial summary judgment with respect to the '075 Patent, genuine issues of material fact concerning the operation of Lansa's newlook product—and, in particular, whether and how newlook employs an algorithm, what the output of that algorithm may be, and whether the algorithm depends on specific field attributes—preclude judgment as a matter of law. This is particularly so in light of the incomplete record presently available [21] and the testimony of ResQNet's expert that newlook determines a screen ID based upon the length, position and type of a plurality of fields typically contained in the first few rows of a screen.

## II. Lansa's Motion for Leave to Amend its Answer and Counterclaims Is Granted

Following the issuance of *ResQNet III*, Lansa moved for leave to amend its affirmative defenses and counterclaims pursuant to Rules 9 and 15(a), Fed.R.Civ.P., to add an affirmative defense and counterclaim alleging that the '075 Patent is unen-

forceable due to inequitable conduct. Lansa brought its motion within weeks of the close of fact discovery, approximately two weeks after *ResQNet III* was issued, and prior to the deadline for summary judgment motions.

Lansa seeks to add a counterclaim that the applicants for the '075 Patent and/or their attorney knowingly withheld prior art that is more material than the prior art they disclosed to the patent examiner during the prosecution of the '075 Patent. Lansa asserts that the factual ground permitting Lansa to make the allegations of inequitable conduct with the requisite particularity were only revealed in June 2004 through deposition testimony, and were further elaborated in the report of Lansa's technical expert, produced in July 2004. Lansa also argues that it should be permitted to amend its affirmative defenses and counterclaims because, prior to the issuance of *ResQNet III*, it believed it had asserted an inequitable conduct defense already.[22]

ResQNet opposes Lansa's motion on the grounds that amendment at this stage of the litigation would be prejudicial to ResQNet, the allegations upon which Lansa would base its defense of inequitable conduct were fully known to Lansa for over three years, the amendment would be futile, and Lansa lacks the proof required to establish inequitable conduct.[23] ResQNet

---

21. *See supra* note 5.

22. In *ResQNet III*, it was concluded that no defense of inequitable conduct had been pled by Lansa. *See ResQNet III*, 2004 WL 1627170, at *4 (noting that "Lansa has not made any allegations concerning specific prior art concealed adequate to establish an affirmative defense of inequitable conduct, nor may [or] will an affirmative defense of inequitable conduct be inferred here from the fact that Lansa has reserved the right to assert additional, unspecified affirmative defenses"). Although Lansa indicated in its opposition papers on the underlying motion in *ResQNet*

*III* that it would seek leave to amend its answer if the Court concluded that no such defense had been pled, this Court explained that, "[a]s Lansa has yet to seek leave for such an amendment, ... the possibility that it may do so at some later date has no bearing on the instant motion." *Id.* at *5 n. 2.

23. Following formal briefing on Lansa's motion, ResQNet submitted a letter brief in lieu of a formal motion to file a surreply, to which Lansa offered a letter brief in opposition. Both letter briefs have been considered in deciding Lansa's underlying motion.

also seeks an award of fees and costs as well as sanctions payable to the Court based on what it deems Lansa's frivolous motion.

### A. The Rule 15(a) Standard

Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Nonetheless, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also SCS Communications,* 360 F.3d at 345 ("[U]nder Fed. R.Civ.P. 15(a), leave to amend a pleading may *only* be given when factors such as undue delay or undue prejudice to the opposing party are absent.") (emphasis in original); *Littlejohn v. Artuz,* 271 F.3d 360, 363 (2d Cir.2001) ("[A]lthough Rule 15 requires that leave to amend be 'freely given,' district courts nonetheless retain the discretion to deny that leave in order to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive.").

■■■■ To determine whether there would be undue prejudice from a proposed amendment, a court must consider whether the new aspects of the proposed pleading would " '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.' " *Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 284 (2d Cir.2000) (quoting *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993)). Delay alone, in the absence of a showing of undue prejudice or bad faith, typically provides an insufficient basis for denying a motion to amend. *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 339 (2d Cir.2000); *Rachman Bag Co. v. Liberty Mut. Ins. Co.,* 46 F.3d 230, 234–35 (2d Cir.1995) (citing *State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981)). "The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial." *Fariello v. Campbell,* 860 F.Supp. 54, 70 (E.D.N.Y.1994) (citing *Panzella v. Skou,* 471 F.Supp. 303, 305 (S.D.N.Y.1979)); *see also European Cmty. v. RJR Nabisco, Inc.,* 150 F.Supp.2d 456, 502–03 (E.D.N.Y.2001) (citing *Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 123 (E.D.N.Y.1996)).

■■■ Likewise, the party opposing a motion to amend bears the burden of establishing that an amendment would be futile. *See Blaskiewicz v. County of Suffolk,* 29 F.Supp.2d 134, 137–38 (E.D.N.Y. 1998) (citing *Harrison v. NBD Inc.,* 990 F.Supp. 179, 185 (E.D.N.Y.1998)). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Oneida Indian Nation of New York v. City of Sherrill, New York,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)), *cert. granted,* —— U.S. ——, 124 S.Ct. 2904, 159 L.Ed.2d 811 (2004); *see also A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 298 (S.D.N.Y.2000) (explaining that if the proposed amendment "would be subject to 'immediate dismissal' for failure to state a claim or on some other ground, the Court will not permit the amendment") (quoting *Jones v. New York State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999)).

### B. Lansa's Motion Is Granted

■■■ ResQNet contends that Lansa has impermissibly delayed in seeking the in-

stant amendment, as every fact alleged by Lansa to support its claim of inequitable conduct was known to Lansa since shortly after the filing of this action in 2001. As ResQNet notes and Lansa does not dispute, Lansa has been in possession of the relevant file histories of the patents-in-suit since shortly after this case was filed in 2001, from which any purported failure to cite certain prior art references now identified by Lansa in its proposed amendment would have been readily apparent. Nonetheless, it appears that the expert reports and testimony rendered in June and July 2004 have yielded details relevant to the proposed counterclaim, including the expert's opinion as to the materiality of certain purportedly prior art references to the claims of the '075 Patent and the acknowledgment by one of the named inventors of the '075 Patent that certain of these references were known to him before the filing of the '075 Patent application. Lansa argues that it is only upon the development of these details that it possessed sufficient information to plead the statements that constitute inequitable conduct, the identity of those committing the inequitable conduct, where and when the actions were made, and why the actions were material in accordance with the requirements of Rule 9(b), Fed.R.Civ.P. *See ResQNet III*, 2004 WL 1627170, at \*4 (stating that "inequitable conduct ... must be pled with particularity and is subject to the heightened pleading requirements of Fed. R. Civ. Proc. 9(b)").

Learning of a factual basis for a defense after the pleading stage and during discovery provides a "perfectly permissible reason" for failing to assert the defense at the pleading stage. *Zoll v. Jordache Enters. Inc.*, No. 01 Civ. 1339(CSH), 2002 WL

485733, at \*2 (S.D.N.Y. Mar.29, 2002) (citation omitted); *see also Gillette Co. v. Philips Oral Healthcare, Inc.*, No. 99 Civ. 807(LAP)(DF), 2001 WL 1442637, at \*15 (S.D.N.Y. Nov. 15, 2001) (concluding that "there is an understandable reason" for a defendant's delay in asserting a counterclaim where "the facts underlying the counterclaim were not developed until discovery in this action was well underway," and granting the motion for leave to add a counterclaim); *cf. Xpressions Footwear Corp. v. Peters*, Nos. 94 Civ. 6136(JGK) *et al.*, 1995 WL 758761, at \*2 (S.D.N.Y. Dec.22, 1995) ("The federal courts consistently grant motions to amend where it appears that new facts and allegations were developed during discovery, are closely related to the original claim, and are foreshadowed in earlier pleadings.") (citations omitted). Moreover, parties "have been permitted to amend their pleadings to assert new claims long after they acquired the facts necessary to support those claims." *Richardson Greenshields Secs., Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987) (collecting cases); *accord S.E.C. v. DCI Telecomms., Inc.*, 207 F.R.D. 32, 34 (S.D.N.Y.2002). Accordingly, even if it were concluded that Lansa knew or should have known of certain of the facts underlying its proposed counterclaim at the time it filed the presently operative pleading, this Court is not persuaded that Lansa's explanation for its delay is inadequate or the delay itself undue under the circumstances. Furthermore, neither the duration of the apparent delay here nor the interval between filing of the amended answer and counterclaim in this action on December 17, 2001 and the application for leave to further amend brought on August 4, 2004 is any greater than those same periods in cases where amendments have been allowed.[24] *See*

24. *The decision in Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1124 (Fed.Cir.2004) (concluding that the district court had not abused its discre-*tion *in denying a motion to amend filed ten months after the close of discovery and nine months after the filing of summary judgment*

*Richardson Greenshields,* 825 F.2d at 653 n. 6 (collecting cases).

Mere delay provides an insufficient basis to deny a motion to amend absent a showing of bad faith or undue prejudice. *See Parker,* 204 F.3d at 339; *Block,* 988 F.2d at 350. There is no showing that the amendment is being asserted in bad faith here. As to the possibility of undue prejudice, "[a]llegations that an amendment will require the expenditure of additional time, effort, or money do not constitute 'undue prejudice'" *A.V. By Versace,* 87 F.Supp.2d at 299 (quoting *Block,* 988 F.2d at 351). Likewise, "[r]eopening discovery, in and of itself, is not sufficient justification to refuse a Rule 15(a) motion...." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* No. 01 Civ. 11295(CBM), 2004 WL 169746, at *3 (S.D.N.Y. Jan.28, 2004) (citing *United States v. Cont'l Illinois Nat'l Bank & Trust Co.,* 889 F.2d 1248, 1255 (2d Cir. 1989) (noting that "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading")).

Although ResQNet may well seek further discovery if Lansa's motion is granted, ResQNet has offered little more than conclusory assertions concerning the purportedly broad scope of any such discovery, the specter of potential third-party discovery disputes in other jurisdictions, and the cost of retaining a technical expert to address prior art teachings, heretofore not addressed by ResQNet's expert, which ResQNet claims would "likely be significant." (Pl. Aug. 6, 2004 Mem. at 10.) Such dire predictions of cost and effort, without more, are insufficient to establish undue prejudice, nor is it apparent that any further discovery—limited to the issues raised by the proposed counterclaim— would cause significant delay in the resolution of this dispute, for which a trial date is not presently set. **As ResQNet notes**

**in its surreply, Lansa may seek to depose ResQNet's trial counsel on the inequitable conduct defense and possibly to disqualify ResQNet's trial counsel as a result. Although the delay and inconvenience that may be occasioned should ResQNet be required to obtain separate counsel must be weighed in considering the potential prejudice to ResQNet from any amendment by Lansa, see, e.g., *Doe v. Columbia Univ. in City of New York,* 165 F.R.D. 394, 396 (S.D.N.Y.1996), under the circumstances of this case it does not appear that any such prejudice or delay would be undue.** In sum, ResQNet has not established that it would suffer undue prejudice if the proposed amendment is allowed.

Nor has ResQNet succeeded in establishing the futility of the proposed amendment. ResQNet contends that the proposed amendment is futile on the ground that the information Lansa alleges was concealed from the PTO is cumulative and identical to that already cited and thus not material. In support of this contention, ResQNet has cited the testimony of Lansa's expert and the content of various patents not asserted in this litigation. A proposed amendment is only futile where "it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Oneida Indian Nation of New York,* 337 F.3d at 168. As ResQNet has pointed to no defects in the manner in which the proposed amendment is pled or how Lansa proposes to allege a failure to disclose material information, ResQNet's arguments offer no basis to conclude that amendment would be futile and are best addressed on a motion for summary judgment.

ResQNet also argues that Lansa has failed to show an intent to mislead, and that such an intent is critical to any inequitable conduct defense. *See Molins PLC v.*

*motions), upon which ResQNet has relied, is* *distinguishable on the facts.*

*Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir. 1995). According to ResQNet, Lansa has "failed [to] show a single fact that would tend to prove an intent to mislead." (Pl. Aug. 6, 2004 Mem. at 18.) To the degree that ResQNet is suggesting that the proposed amendment fails to allege intent adequately, no such conclusion is warranted, as the amendment sets forth facts giving rise to an arguable inference that ResQNet intended to deceive the PTO by failing to disclose known prior art which Lansa alleges was material. *See, e.g., Rentrop v. Spectranetics Corp.*, No. 04 Civ. 101(PKC), 2004 WL 1243608, at *2 (S.D.N.Y. June 4, 2004) (assessing the sufficiency of an inequitable conduct claim under Rule 9(b), Fed.R.Civ.P.). Furthermore, insofar as ResQNet is arguing that Lansa has failed to establish facts from which intent may be inferred, facts need not be established at the pleading stage. An amendment is only futile where it would not survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., and " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir.2004) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). Accordingly, any purported failure by Lansa to "show" a fact tending to prove the intent to mislead is of no consequence at this stage.

As no undue delay or bad faith by Lansa has been demonstrated, no undue prejudice to ResQNet established, nor the futility of the proposed amendment shown, Lansa's motion for leave to amend its answer and counterclaims is granted, and Lansa is directed to file the amended pleading within ten days of the entry of this opinion and order. ResQNet's request for fees and costs in connection with responding to Lansa's motion is denied, as Lansa's motion is not frivolous.

### III. *Lansa's Motion for Rule 11 Sanctions Is Granted and ResQNet's Motion for Rule 11 Sanctions and for Revocation of the Pro Hac Vice Admission of Attorney Hulme Is Denied*

Lansa has moved for sanctions under Rule 11, Fed.R.Civ.P., against ResQNet and its attorneys on the ground, *inter alia*, that ResQNet failed to perform the prefiling investigation required by the Federal Circuit and that it continued to litigate this action, including by filing an amended complaint, after it admitted that newlook did not infringe the '608 Patent. ResQNet has cross-moved for Rule 11 sanctions and for revocation of the *pro hac vice* admission of Lansa's counsel, Hulme, on the grounds that Lansa's Rule 11 motion was frivolous, Lansa's counsel has made repeated and knowing misrepresentations to the Court in Lansa's Rule 11 papers, and Lansa's products clearly infringe the patents-in-suit.

### A. *The Rule 11 Standard*

Rule 11(b) provides in relevant part that, by presenting to the court a pleading, written motion or other paper, an attorney or party proceeding *pro se* "is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the pleading, written motion or other paper is not being presented for any "improper purpose" and the claims, defenses and other legal contentions are "warranted by existing law or by a non-frivolous argument for the extension, modification of reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11(b). A violation of Rule 11 is thus triggered "when it appears that a pleading has

been interposed for any improper purpose, *or where,* after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985) (emphasis in original); *accord Kropelnicki v. Siegel,* 290 F.3d 118, 131 (2d Cir.2002); *see also Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 369 F.3d 91, 97 (2d Cir.2004) ("Rule 11 sanctions are designed to deter baseless filings . . . .") (citation omitted).

■■■■■ "In evaluating whether the signer of a filing has violated Rule 11, the district court applies an objective standard of reasonableness, examining whether, under the circumstances of a given case, the signer has conducted a 'reasonable inquiry' into the basis of a filing." *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 73 F.3d 1253, 1257 (2d Cir.1992); *see also Eastway Const.,* 762 F.2d at 253 (observing that Rule 11 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed"). Rule 11 does not require a plaintiff "to know at the time of pleading all facts necessary to establish the claim." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,* 271 F.3d 374, 386 (2d Cir.2001) (citing *O'Brien v. Alexander,* 101 F.3d 1479, 1489 (2d Cir.1996) (explaining that Rule 11(b) does not allow the imposition of a sanction for failure to make reasonable inquiry "unless a particular allegation is utterly lacking in support")). Nonetheless, where a claim is baseless, or where a party continues to assert an unfounded position, a violation of Rule 11 may be found. *See, e.g., Gambello v. Time Warner Communications, Inc.,* 186 F.Supp.2d 209, 229 (E.D.N.Y.2002) (observing that "a litigant's obligations with

respect to the contents of . . . papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit") (citing *O'Brien,* 101 F.3d at 1480).

■■■ In the context of patent infringement actions, the Federal Circuit has interpreted Rule 11 to require, "at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Q–Pharma, Inc. v. Andrew Jergens Co.,* 360 F.3d 1295, 1300–01 (Fed.Cir.2004); *accord View Eng'g, Inc. v. Robotic Vision Sys., Inc.,* 208 F.3d 981, 986 (Fed. Cir.2000) (affirming the district court's imposition of Rule 11 sanctions where counsel had "performed neither a formal nor an informal analysis of any sort" and thus failed to conduct a "reasonable inquiry for the purpose of filing patent infringement claims"). "The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11." *Id.; see also Q–Pharma,* 360 F.3d at 1302 (observing that "our case law makes clear that the key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis" and explaining that "an infringement analysis can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter"). Thus, where neither the plaintiff nor his counsel "had made a reasonable effort to ascertain whether the accused devices satisfied the two key claim limitations," the Federal Circuit has imposed sanctions under a rule of the Court of Fed-

eral Claims modeled after Rule 11, Fed. R.Civ.P. *Judin v. United States,* 110 F.3d 780, 784 (Fed.Cir.1997) (noting that "[n]o adequate explanation was offered for why they failed to obtain, or attempted to obtain, a sample of the accused device from the Postal Service or a vendor so that its actual design and functioning could be compared with the claims of the patent").

The courts have declined to impose any special, pre-filing investigation requirements upon the plaintiff in patent cases independent of Rule 11. *See, e.g., Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.,* 351 F.3d 1139, 1150 (Fed.Cir.2003).

### B. *Lansa's Motion Is Granted In Part And Otherwise Denied*

Lansa has argued that sanctions are warranted in light of, among other grounds, ResQNet's failure to make the requisite pre-filing inquiry and infringement analysis prior to its filing of the original complaint in this action. In particular, Lansa cites the deposition testimony of the inventors listed on the various patents, both officers of ResQNet, who each disclaimed having any real understanding of how newlook functions. In response, ResQNet has submitted time records demonstrating that some 4.75 hours were dedicated to pre-suit investigation, and another 3.30 hours spent on communications involving the matter. The accompanying declaration states that these time records reflect time spent examining the newlook website and product in order to determine whether a viable infringement theory existed prior to filing suit. Further, various documents concerning newlook have been submitted, some un-

specified portion of which, according to ResQNet, were printed and reviewed during the pre-filing investigation.

█ The "key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis." *Q–Pharma,* 360 F.3d at 1302. Although the evidence that such an analysis was accomplished here is minimal,[25] under the law of the Federal Circuit "an infringement analysis can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter." *Id.* In view of ResQNet's counsel's familiarity with the patents-in-suit and the somewhat vague representations in ResQNet's counsel's declaration to the effect that the newlook website and product were examined to determine possible infringement, it may not be said that no informal comparison was accomplished sufficient to satisfy the Federal Circuit's pre-filing requirements. That ResQNet's counsel may have demonstrated a tenuous understanding of the accused product and of the various prosecution histories of the patents-in-suit post-filing—as is suggested by a declaration submitted by Lansa—provides no separate basis upon which to conclude that an inadequate pre-filing investigation or pre-filing analysis was conducted, nor has Lansa offered any authority for the proposition that the degree or depth of understanding subsequently exhibited by counsel may suffice to show such failings.

█ Of more consequence are Lansa's arguments that ResQNet continued to litigate certain of its claims, including its claims as to the '608 Patent and the '127 Patent, notwithstanding its representation

---

25. It was only in a declaration submitted in response to Lansa's sur-reply that ResQNet succinctly set forth its counsel's activities prior to the filing of this action. According to ResQNet's counsel, he "reviewed each and every patent that was asserted and [he] com-pared at least one claim to the Newlook system, as [he] understood it from both [his] own examination of Newlook documents and the website and that of [his] colleagues." (Declaration of Jeffrey I. Kaplan, dated Oct. 26, 2004, at ¶ 3.)

to Lansa in September 2001 that it would remove those patents from the litigation, as they appeared not to be infringed by Lansa's product. Lansa bases its argument on the substance of a letter by counsel for ResQNet dated September 21, 2001 (the "September letter") bearing the designation "for settlement only," [26] wherein counsel for ResQNet explained:

> 1) With respect to the '127 patent, it does not appear that the Lansa system would infringe any claim, either literally or under the doctrine of equivalents. Thus, presuming we discover no contrary evidence as the case moves forward, [ResQNet] is prepared to remove this patent from the litigation.
>
> 2) With regard to the '608 patent, your detailed letter and the materials we have appear to show that the Lansa system does not infringe the claim in the '608 patent. Accordingly, unless we discover evidence to the contrary, ResQNet is also prepared at this point to remove the '608 patent from the litigation.

(September letter, Affidavit of James H. Hulme, dated Sept. 3, 2004 ("Sept. 3 Hulme Aff."), Exh. C, at 1.) The September letter further states: "As you should see from our willingness above to drop from this suit two patents, which *now appear not to be infringed,* our firm views it as unprofessional and improper to pursue a claim without any merit." (*Id.* at 2 (emphasis supplied).) Notwithstanding the foregoing statements by ResQNet's counsel, both the '127 Patent and the '608

Patent were reasserted as patents-in-suit in ResQNet's amended complaint, filed on December 4, 2001. The '127 Patent was informally withdrawn from the action at some time prior to June 2002, although the parties dispute the point at which this withdrawal was accomplished,[27] and the '608 Patent, as is evident from the preceding discussion of Lansa's motion for partial summary judgment, is still being asserted.

In response to Lansa's arguments, ResQNet has explained that over the course of settlement discussions it was "determined" that ResQNet's belief that the '127 Patent was being infringed by newlook was incorrect based upon Lansa's explanation of its product, and that, after "this was verified," the claim was dropped. (Pl. Sept. 27, 2004 Mem. at 6.) The settlement discussions in question occurred, according to ResQNet, while Lansa obtained extensions of time to answer the original complaint. In other words, ResQNet "determined" that its belief that newlook infringed the '127 Patent was incorrect prior to the filing of the amended complaint. Notwithstanding this determination that the '127 Patent was not infringed by Lansa's system, ResQNet proceeded to assert in the amended complaint that Lansa was "manufacturing and selling software programs[ ] that infringe upon the language of the claims of the '127 patent." (Am. Compl. at ¶ 33.) The '127 Patent claims were dropped, according to ResQNet, "immediately upon learning that [ResQNet] had the facts incorrect" and prior to any

---

**26.** ResQNet argues that the September letter is inadmissible under Rule 408, Fed.R.Evid. Pursuant to that very Rule, however, the letter may be considered for purposes other than to "prove liability for or invalidity of the claim or its amount," as Rule 408 "does not require exclusion when the evidence is offered for another purpose...." Fed.R.Evid. 408; *see also Conmed Corp. v. ERBE Electromedizin GmbH,* 129 F.Supp.2d 461, 467 n. 4 (N.D.N.Y.2001).

**27.** Lansa's initial claim construction brief submitted on May 13, 2002 addressed all five of the patents named in the amended complaint and no order concerning the withdrawal of the '127 Patent claim appears on the public docket until November 2002, when summary judgment was entered on consent of the parties.

significant discovery or litigation, demonstrating, in ResQNet's view, good faith on ResQnet's part. (Pl. Sept. 27, 2004 Mem. at 8.) *With respect to the '608 Patent claim, ResQNet has simply stated that it decided not to drop the claim when documents produced by Lansa during discovery "refuted Lansa's explanation" of the '608 Patent. (Pl. Oct. 22, 2004 Reply Mem. at 6.)* ResQNet has offered no explanation in response to Lansa's assertions concerning the '608 Patent and ResQNet's representations in the September letter that it did not believe the '608 Patent to be infringed by Lansa's product.

By presenting to the Court a pleading, an attorney is "certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ... the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery...." Fed.R.Civ.P. 11(b). By filing the amended complaint in December 2001, notwithstanding its own professed determination in September 2001 that the '127 Patent and the '608 Patent were not infringed by Lansa's software and seemingly, and significantly, in the absence of any intervening information, investigation or analysis from which a contrary belief or determination might have been developed, ResQNet, through its counsel, presented a pleading to the Court in contravention of the dictates of Rule 11, thereby requiring Lansa to defend against claims that ResQNet itself believed to be unfounded. The fact that ResQNet dropped the '127 Patent claims within months of filing the amended complaint and prior to any significant discovery only serves to underscore this conclusion, and the fact that ResQNet's claims concerning the '608 Patent are still present in this litigation does nothing to undermine it. Simply put, on *the present record, it was unreasonable for ResQNet, through its attorneys, to proceed to file an amended complaint containing allegations of infringement of the '127 Patent and the '608 Patent.* Under these circumstances, the imposition of Rule 11 sanctions is warranted. *See generally View Eng'g*, 208 F.3d at 986 ("A patent suit can be an expensive proposition. Defending against baseless claims of infringement subjects the alleged infringer to undue costs—precisely the scenario Rule 11 contemplates.").

Lansa has also sought sanctions on the ground that ResQNet's approach to this case was structured to obfuscate the inadequacy of its claims. In support of its argument, Lansa has cited this Court's opinion in *Universal City Studios, Inc. v. Nintendo Co.*, 615 F.Supp. 838 (S.D.N.Y. 1985), *aff'd*, 797 F.2d 70 (2d Cir.1986), in which it was concluded that the plaintiff had instituted its lawsuit without good faith and the requisite probable cause. In that matter, the plaintiff was found to have acted in bad faith due, in part, to the manner in which it prosecuted its claim:

> Universal's limited investigation of the merits of the underlying claim was intentionally structured so that the inadequacy of the claim would remain obscured while the collateral benefits of the litigation were enjoyed. Only by consciously avoiding discovery of the lack of merit of the underlying claim could Universal hope to accomplish its goal.

*Universal City Studios*, 615 F.Supp. at 862. In the absence of any showing that ResQNet consciously avoided discovery of the merits of any of its claims and in view of the substantial documentary and testimonial evidence submitted in conjunction with the various motions discussed herein, it does not appear that ResQNet relied on any limited investigation after the commencement of the litigation in order to

reap the collateral benefits of the litigation. Further, to the extent that Lansa has sought sanctions on the ground that ResQNet's pursuit of the infringement claim for the '075 Patent is baseless, genuine issues of material fact preclude any determination in this regard, as set forth above, although Lansa is hereby granted leave to renew its application upon resolution of the '075 Patent claim.

In sum, Lansa's motion for Rule 11 sanctions is granted to the extent that ResQNet and its attorneys are sanctioned for filing an amended complaint containing claims with regard to the '127 Patent and the '608 Patent after having expressly determined that the prior belief of infringement of those patents had been incorrect and in the absence of any intervening developments from which a good faith basis to bring the claims might be inferred. The calculation of the amount of the sanction to be imposed and the apportionment of that sanction between ResQNet and its attorneys are deferred until after the remaining claims in this action have been resolved at trial.

### C. *ResQNet's Motion Is Denied*

ResQNet has cross-moved for Rule 11 sanctions and for the revocation of the *pro hac vice* admission of Lansa's counsel, Hulme, on the grounds that Lansa's Rule 11 motion was frivolous, Lansa's counsel has made repeated and knowing misrepresentations to the Court in Lansa's Rule 11 papers, and Lansa's products, in ResQNet's estimation, clearly infringe the patents-in-suit.

As Lansa's motion and the arguments made therein are not patently frivolous, and the remaining grounds identified have not been shown to warrant the imposition of sanctions, ResQNet's motion is denied. ResQNet's request for an award of its costs and fees in connection with its motion is likewise denied.

*Conclusion*

For the reasons set forth above and upon the conditions stated, Lansa's motion for partial summary judgment on the '075 Patent for invalidity is denied, ResQNet's motion to strike the invalidity defense as to the '075 Patent is denied, ResQNet's motion for partial summary judgment of infringement of the '075 Patent is denied, Lansa's motion for partial summary judgment of non-infringement of the '075 Patent is denied, Lansa's motion for partial summary judgment of non-infringement of the '608 Patent is denied, ResQNet's motion for leave to file a surreply is granted, Lansa's motion for leave to amend its answer and counterclaims is granted, Lansa's motion for sanctions is granted in part and otherwise denied, and ResQNet's motion for sanctions and to revoke the *pro hac vice* status of Lansa's counsel is denied. Lansa is directed to file an amended pleading, as set forth above, within ten days of the entry of this opinion and order.

It is so ordered.